406                    80 Mass. App. Ct. 406 (2011)

Zoning Board of Appeals of Holliston *v.* Housing Appeals Committee.

ZONING BOARD OF APPEALS OF HOLLISTON *vs.* HOUSING
APPEALS COMMITTEE & another.[1]

No. 10-P-1964.

Suffolk. May 9, 2011. - September 16, 2011.

Present: KANTROWITZ, KAFKER, & GRAHAM, JJ.

*Zoning,* Comprehensive permit, Housing appeals committee, Low and moder-
ate income housing, Conditions. *Housing. Administrative Law,* Substantial
evidence, Substantial evidence.

Discussion of the Comprehensive Permit Act, G. L. c. 40B, §§ 20-23. [413-415]
A Superior Court judge did not err in affirming a decision of the Housing
    Appeals Committee (committee) that ordered a local zoning board (board)
    to issue a comprehensive permit pursuant to G. L. c. 40B, §§ 20-23, for
    the development of a parcel of land into residential condominium units
    that included affordable housing, where it was not unreasonable for either
    the committee or the judge to conclude that the developer had established
    a prima facie case [415-416], and where it could not be said on the record
    of the case that the board had demonstrated a local concern with regard to
    environmental contamination, wetlands, or stormwater management that
    exceeded the need for the type of affordable housing that the development
    would provide [416-422].


CIVIL ACTION commenced in the Land Court Department on
February 11, 2009.

The case was heard by *Keith C. Long*, J., on a motion for
judgment on the pleadings.

*Mark Bobrowski* for the plaintiff.

*Robert A. Fasanella* for Green View Realty, LLC.

*David A. Guberman*, Assistant Attorney General, for Housing
Appeals Committee.

KAFKER, J. The zoning board of appeals of Holliston (board)
denied the application of Green View Realty, LLC (GVR), for
a comprehensive permit pursuant to G. L. c. 40B, §§ 20-23, to

[1]Green View Realty, LLC.

develop a nearly fifty-three acre parcel of land (locus or site) in the town of Holliston (town) into residential condominium units that include affordable housing. The locus served as an illegal disposal site for hazardous materials in the 1970s and 1980s and despite substantial cleanup efforts, portions of the locus remain contaminated, including the groundwater in some areas. GVR proposes to clean up the locus such that it poses no significant risk to residents. The locus also contains some sixteen acres of wetlands and presents challenges for storm water management and waste disposal as well.

The board denied GVR's application, identifying what it concluded were overriding local concerns relative to health, wetlands preservation, storm water management, traffic, and waste disposal.[2] On appeal to the Housing Appeals Committee (HAC), the HAC ordered the board to issue a comprehensive permit. A Land Court judge affirmed the HAC's decision, and the board now appeals. We affirm.

*Background.* 1. *Environmental history of the locus.* Beginning in the 1960s, long before GVR developed any interest in the locus, construction materials, tar, tires, and other hazardous materials were dumped on the locus. Because the prior owner did not respond to notices of response action issued pursuant to G. L. c. 21E by the Department of Environmental Protection (DEP), between 1987 and 2002, the DEP and the Environmental Protection Agency (EPA) directed the removal of some 340 drums of tar and other contaminants, 210,000 tires, construction debris, and over seventy tons of contaminated soil. The DEP incurred response action costs amounting to $1.75 million. Nonetheless, the cleanup is not complete, and in addition to remaining hazardous materials, some of the groundwater contains trychloroethylene (TCE), a known carcinogen. TCE has also migrated to abutters' wells.[3]

2. *GVR's proposal.* In 2002, in an effort to recoup the cleanup costs they had incurred, the DEP and the town solicited proposals to attract a developer to purchase and develop the site.

---

[2] On appeal to this court, the board has abandoned any issues regarding traffic and waste disposal. In addition, the board makes no arguments related to site design in terms of building placement or density.

[3] Conversion to town water has alleviated at least some of the dangers to abutters from the migrated contamination.

In response to the solicitation, GVR, a limited dividend organization,[4] proposes to construct 200 condominium units, twenty-five percent of which will be "affordably priced housing units enabling families with a gross annual income of 80% of the area median income to qualify to purchase [a] unit under generally accepted mortgage loan underwriting standards." GVR has in place purchase and sale agreements to purchase the locus and has negotiated with the DEP an amount to compensate it for its costs.[5]

On August 27, 2004, the Massachusetts Housing Finance Agency (MassHousing) issued GVR a project eligibility (site approval) letter with certain conditions, including that any comprehensive permit ultimately issued by the board include a condition that GVR provide evidence of "[c]ompliance with all statutory and regulatory restrictions and conditions relating to protection of drainage, wetlands, vernal pools and wildlife habitats and nearby conservation areas," as well as Title V regulations, prior to issuance of a building permit for the project.

a. *Environmental cleanup.* As part of a settlement agreement[6] with DEP, GVR is obligated to sign and comply with an administrative consent order (ACO) which will set forth deadlines for response actions required pursuant to G. L. c. 21E and the Massachusetts Contingency Plan (MCP). "Simply put, G. L. c. 21E was drafted in a comprehensive fashion to compel the

---

[4]After briefs were submitted and oral argument was held in this court, the board filed papers suggesting GVR had been dissolved by the Secretary of State and arguing that because its status as a limited dividend organization is a jurisdictional prerequisite to submitting an application for a comprehensive permit pursuant to G. L. c. 40B, § 21, and 760 Code Mass. Regs. § 56.04(1) (2008), GVR lacks standing to proceed with this appeal. GVR responded with a certificate of good standing from the Commonwealth. While it is likely that what the board views as a " 'jurisdictional requirement' is more properly viewed as a substantive aspect of the successful applicant's prima facie case for entitlement to a particular government benefit, in this case, a comprehensive permit," given the unrebutted evidence of GVR's intact corporate status, we need not reach the issue. *Middleborough* v. *Housing Appeals Comm.,* 449 Mass. 514, 520-521 (2007).

[5]GVR has agreed to pay DEP between $1.25 million and $1.75 million.

[6]R&C Realty Trust and C&R Realty Trust, the current owners of the locus, and GVR, under agreement to purchase the locus, brought an action in the Superior Court challenging the Commonwealth's G. L. c. 21E liens on the property. The parties entered into a settlement agreement on or about June 3, 2008. It is this settlement agreement that outlines GVR's payment obligations to DEP. See note 5, *supra.*

prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties. To that end, the department has promulgated extensive regulations, known collectively as the [MCP,] . . . for purposes of implementing, administering, and enforcing G. L. c. 21E." *Bank* v. *Thermo Elemental, Inc.*, 451 Mass. 638, 653 (2008), quoting from *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. 217, 223 (2002). "The purpose of the MCP is, among other things, to 'provide for the protection of health, safety, public welfare and the environment' by encouraging 'persons responsible for releases . . . of . . . hazardous material to undertake necessary and appropriate response actions in a timely way.' " *Ibid.*, quoting from 310 Code Mass. Regs. § 40.0002 (1995).

The specifics of GVR's obligations, including the extent to which the property must be remediated, however, are not contained in the settlement agreement. Nonetheless, the conceptual plan submitted with GVR's application for the comprehensive permit was created by a licensed site professional (LSP) and proposes to clean the property, prior to development, to a condition of "no significant risk" as that term is used in the MCP. The phrase "no significant risk" "means a level of control of each identified substance of concern at a site or in the surrounding environment such that no such substance of concern shall present a significant risk of harm to health, safety, public welfare or the environment during any foreseeable period of time." 310 Code Mass. Regs. § 40.0006 (2006).

More specifically, GVR's conceptual plan proposes to transport the remaining hazardous materials and any recyclables off site; consolidate nonhazardous materials into a smaller sealed and capped area on the western portion of the site; and treat and monitor the groundwater as necessary. Current plans call for treating the contaminated groundwater with hydrogen release compound (HRC), which facilitates degradation of TCE. GVR concedes, however, that additional testing is necessary, and remediation plans may change depending on the outcome of the testing. In addition, GVR concedes that treatment of TCE with HRC can sometimes produce vinyl chloride (VC), a compound that is even more toxic than TCE. GVR proposes to monitor the remediation efforts for that contingency, however, and use

410                  80 Mass. App. Ct. 406 (2011)

Zoning Board of Appeals of Holliston *v.* Housing Appeals Committee.

alternative methods should pilot testing indicate they are warranted. GVR points out that HRC has been used successfully in many locations, including another location in town. Moreover, the record supports the judge's conclusion that long-term testing will be conducted to monitor soil, gas, and groundwater to ensure continuous compliance.

Based on our review of the testimony and documentary evidence, it is our understanding that GVR's plan is to do whatever it takes to achieve a condition of "no significant risk." GVR accepts that this status must be achieved in order to proceed with the project, and its experts are confident it can be achieved. Even one of the board's experts concedes that the plan is feasible based on the information that is currently available. All of the parties agree, however, that additional testing is necessary, which may result in different approaches to remediating the locus. While it is our understanding that GVR is committed to making any necessary changes, the additional testing necessary to create a final remediation plan is quite costly. Until GVR completes the purchase of the locus, it has no obligation to clean up the property. As explained by GVR's principal, although GVR is prepared to accept responsibility for the cleanup and bring the property into compliance with the MCP, GVR "cannot and will not enter into [a] binding ACO without first knowing that development at the property can go forward."

The HAC concluded with regard to environmental considerations that consolidation of the onsite landfill, remediation, and the related issue of groundwater protection were not regulated under the town's zoning by-law and, therefore, were not properly before the HAC. The HAC further concluded that because environmental authorities will review these issues, there was no reason for the HAC to make an exception to its general rule of not considering unregulated matters. The Land Court judge concluded that the DEP will oversee the remediation process and will ensure compliance with all applicable environmental statutes and regulations. As such, the judge concluded that the board had not shown that local environmental concerns outweigh the regional need for housing.

b. *The wetlands.* The site contains five separate wetland areas. In the northeastern corner of the locus is a man-made pond with

80 Mass. App. Ct. 406 (2011)                                    411

Zoning Board of Appeals of Holliston v. Housing Appeals Committee.

a narrow wetland area along its banks. GVR proposes to construct a large storm water basin adjacent to this wetland and to revegetate the basin with indigenous hydric species, which will increase the over-all wetland area of the locus. The existing wetland will not be disturbed, but much of the fifty-foot "do not disturb" zone contained in the local by-law will be incorporated into the storm water basin.

The two largest wetland areas are located on the western one-third of the locus, and they are referred to as "Wetland Series A/D" and include a vernal pool. The two wetland areas are separated from one another by an existing roadway and are part of an extensive swamp area that extends well beyond the borders of the locus. The one hundred foot buffer zone surrounding the locus consists largely of a forested area and a denuded former landfill slope leading to an old, disturbed field and shrub habitat. GVR proposes to leave the forested wetland areas intact and to excavate the denuded slope to create a very large storm water basin, "basin 7P." Again, basin 7P will be revegetated with indigenous species and will become a wetland itself.

Finally, the locus contains two isolated wetland areas, "wetland B" and "wetland C," which are protected by the local by-law only. Wetland B will not be altered. Wetland C, however, served as a dump site for old stumps. GVR proposes to excavate the wetland, remove the stumps, and incorporate the wetland into basin 7P to increase flood storage capacity. As noted above, according to GVR's experts, the basin will be revegetated with indigenous species, will become a wetland itself, and will enhance the function of the degraded wetland.

Work in and near the wetlands is regulated by the Wetlands Protection Act (WPA) and the town's locally adopted wetlands administration by-law regulations (local wetland regulations). As compared to the WPA, the local wetland regulations contain a stricter "no disturbance" zone and larger buffers, and they regulate small isolated wetlands that are not regulated by the WPA. GVR has requested a waiver of all the local wetland regulations to the extent they exceed the requirements of the WPA, but asserts it will comply with the requirements of the WPA and associated State regulations.

Because the local conservation commission performs the initial review under the WPA, GVR must submit a notice of

intent to the conservation commission before any work in or near the wetlands may begin.[7] Should the conservation commission determine that the proposal does not comply with State regulations and issue a denial of the notice of intent, GVR may proceed to the DEP for a superseding order of conditions. In denying the plan, the board pointed to GVR's requested waivers of the local by-law requirements. In addition, the board contends that the plan as proposed does not comply with current requirements of the WPA and its associated regulations.

With regard to the wetlands, the HAC concluded that GVR's wetlands expert's reasonably specific description of the design elements that may affect the five wetland areas, GVR's commitment to comply with the WPA, and GVR's expert's testimony that the project "will result in no significant adverse impacts to wetland resource areas both under the WPA and the [town's] Bylaw" are sufficient to establish GVR's prima facie case of compliance with Federal and State statutes or regulations or with generally recognized standards as required by 760 Code Mass. Regs. § 56.07(2)(a)(2) (2008).[8] The HAC further concluded that the wetlands function actually will be enhanced and that the board had failed to demonstrate that compliance with the local by-law is necessary to adequately protect a local concern that exceeds the need for low and moderate income housing. The judge essentially agreed.

c. *Stormwater management.* As noted in the wetlands description, GVR proposes to manage stormwater by creating large wetland retention basins. GVR concedes that while its stormwater management system complied with the DEP's Best Management Practices and Guidelines as well as the DEP's 1997 Storm Water Management Guidelines, the DEP amended those standards in January of 2008. GVR has committed to revising its plans to meet the 2008 standards. The board's expert contends that revi-

---

[7]The conservation commission makes the initial review of a project that is governed by the WPA "for the familiar purposes of bringing local knowledge to bear on local conditions and reducing the administrative burden on a Statewide agency." *Department of Envtl. Quality Engr.* v. *Cumberland Farms of Conn. Inc.,* 18 Mass. App. Ct. 672, 676 (1984), quoting from *Hamilton* v. *Conservation Commn. of Orleans,* 12 Mass. App. Ct. 359, 368 (1981).

[8]For a more extensive discussion of the prima facie case requirements, see *infra.*

sions to comply with the 2008 standards are not physically feasible. For example, the board contends that there is inadequate space to achieve the length of separation between the wetlands and the storm basins required. While the HAC generally accepted GVR's expert's testimony and agreed that the plan to meet State standards is feasible, it ensured that any problems noted by the board's expert would be remedied by adding a condition that the plan comply with current State standards and noted that the DEP will review the storm water management plan to ensure compliance with State standards. The judge agreed and further noted that the board had failed to demonstrate any harm that would result from lack of compliance with local regulations.

*Discussion.* 1. *Review under G. L. c. 40B.* The Comprehensive Permit Act, G. L. c. 40B, §§ 20-23 (Act), is designed to facilitate the development of low and moderate income housing in communities throughout the Commonwealth. The "act was intended to remove various obstacles to the development of affordable housing, including regulatory requirements that had been utilized by local opponents as a means of thwarting such development in their towns." *Dennis Hous. Corp.* v. *Zoning Bd. of Appeals of Dennis*, 439 Mass. 71, 76 (2003). The procedural path and applicable standards of review have been "thoroughly canvassed in earlier opinions." *Board of Appeals of Woburn* v. *Housing Appeals Comm.*, 451 Mass. 581, 582 (2008), quoting from *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 516 (2007). We summarize only the relevant portions of the Act and supplement as needed for specific issues.

Rather than proceed before multiple town or city boards, a qualified developer may submit to the local board of appeals a single application, and the board of appeals, with input from other local boards, is empowered to issue all necessary permits or approvals. See *Dennis Hous. Corp.*, 439 Mass. at 76-77. In considering an application, the board has the power to override local regulations but not State regulations. *Id.* at 80 ("comprehensive permit scheme was designed to override local ordinances, bylaws, and regulations that impeded the development of affordable housing, not Statewide requirements set by the Legislature and State agencies"). See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 354-355 (1973)

(board has same power as HAC to override local requirements). Where, as here, the board denies a permit application, the applicant may appeal to the HAC. G. L. c. 40B, § 22.

The HAC's review is limited to the issue whether "the decision of the board of appeals was reasonable and consistent with local needs." G. L. c. 40B, § 23, amended by St. 1998, c. 161, § 261. "[R]equirements and regulations shall be considered consistent with local needs if they are reasonable in view of the regional need for low and moderate income housing considered with the number of low income persons in the city or town affected and the need to protect the health or safety of the occupants of the proposed housing or of the residents of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces." G. L. c. 40B, § 20, amended by St. 2003, c. 26, § 181. There exists a rebuttable presumption that the regional affordable housing need outweighs local concerns where the town's stock of low and moderate income housing is less than ten percent. *Zoning Bd. of Appeals of Canton* v. *Housing Appeals Comm.*, 76 Mass. App. Ct. 467, 469-470 (2010). Here, it is undisputed that the town's stock of low or moderate income housing is less than ten percent. In fact, the town has only 3.15 percent low or moderate income housing. But even where "a municipality has failed to meet its statutory minimum[,] the HAC may still uphold denial of the permit as 'reasonable and consistent with local needs' if the community's need for low or moderate income housing is outweighed by valid planning objections to the proposal based on considerations such as health, site, design, and the need to preserve open space." *Hingham* v. *Department of Hous. & Community Dev.*, 451 Mass. 501, 504 n.6 (2008), quoting from *Zoning Bd. of Appeals of Greenfield* v. *Housing Appeals Comm.*, 15 Mass. App. Ct. 553, 557 (1983).

Parties aggrieved by the HAC's decision may appeal to the Superior or Land Court pursuant to G. L. c. 30A, § 14. See G. L. c. 40B, § 22. The courts apply a substantial evidence standard of review of the administrative record "in light of the heavy burden borne by a local board that denies a comprehensive permit application" to prove "a specific health or safety concern of sufficient gravity to outweigh the regional housing

need." *Zoning Bd. of Appeals of Canton*, 76 Mass. App. Ct. at 473. The HAC's decision must be upheld if supported by substantial evidence, and we must indulge all rational presumptions in favor of the validity of the HAC's determinations, including its choice between two fairly conflicting views, giving due weight to its experience, technical competence, and specialized knowledge. See *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. at 523-524, 528-529.

2. *Prima facie case.* Before the HAC, a developer whose comprehensive permit has been denied may establish a prima facie case by proving "that its proposal complies with federal or state statutes or regulations, or with generally recognized standards as to matters of health, safety, the environment, design, open space, or other matters of Local Concern." 760 Code Mass. Regs. § 56.07(2)(a)(2) (2008). It is only after the developer meets this standard that the burden shifts to the board to show that there is an overriding local concern that exceeds the regional need for affordable housing. Here, the board's principal argument on appeal is that the plans submitted are too indefinite to allow the board to determine whether the plans comply with State statutes and regulations with regard to remediation of the contamination on the locus, wetland preservation, and stormwater management. Given the deficiencies in the plans, the board contends, granting a comprehensive permit on plans that require modification deprives the board of a fair opportunity to challenge the proposal. As such, the board argues that GVR did not carry its burden of proving a prima facie case.

The regulatory scheme governing applications for comprehensive permits, however, requires only preliminary plans, including "preliminary site development plans," "a report on existing site conditions and a summary of conditions in the surrounding areas," "preliminary, scaled, architectural drawings," a "preliminary subdivision plan," and a "preliminary utilities plan showing the proposed location and types of sewage, drainage, and water facilities." 760 Code Mass. Regs. § 56.05(2) (2008). To the extent the preliminary plans submitted by GVR are lacking or in fact admittedly do not comply with current State regulations or standards, GVR's proposal does not end with the plans. GVR proposes to make all modifications necessary to achieve

416                                80 Mass. App. Ct. 406 (2011)

Zoning Board of Appeals of Holliston v. Housing Appeals Committee.

compliance with State regulations. In fact, compliance with all statutory and regulatory restrictions and conditions relating to protection of drainage, wetlands, vernal pools, wildlife habitats, nearby conservation areas, and "Title V regulations" is a condition of GVR's site approval by MassHousing. In addition, the HAC's decision requires that the comprehensive permit include a condition that "[a]ll design features shall comply with the state [WPA], including all DEP Stormwater Management Guidelines, subject to review by the Holliston Conservation Commission and the [DEP]."

It has long been held that it is unreasonable for a board to withhold approval of an application for a comprehensive permit when it could condition approval on the tendering of a suitable plan that would comply with State standards. *Board of Appeals of Hanover*, 363 Mass. at 381 ("Since the board could have issued a permit subject to the condition of tendering a suitable disposal plan and since these plans had to comply with State standards, whatever their particular design, the [HAC's] decision that the board had unreasonably rejected the applicant's original plans was warranted"). See *Zoning Bd. of Appeals of Amesbury* v. *Housing Appeals Comm.*, 457 Mass. 748, 765 & n.21 (2010) (board does not exceed authority by imposing condition of compliance with stormwater management requirements). Given GVR's proposal to (i) remediate the property under the direction of the DEP to a condition of no significant risk in compliance with the MCP and DEP regulations; (ii) modify its plans for the areas protected by the WPA to comply with the WPA and associated regulations with review by the conservation commission and the DEP to ensure compliance; and (iii) modify its stormwater management system to meet the revised DEP guidelines with review by the conservation commission and the DEP to ensure compliance, it was not unreasonable for the HAC and the judge to conclude that GVR had established a prima facie case.[9]

3. *Local concerns.* Having concluded that GVR met its burden

---

[9]While we appreciate the board's reluctance to sign off on plans that require further modification in order to comply with State law and regulations, the three issues the board pursues on appeal — cleanup of the site, protection of the wetlands, and stormwater management — are each subject to State review to ensure compliance with State regulations. It may well be that with regard to

to present a prima facie case, we consider whether, assuming compliance with State requirements, the board nonetheless identified "a valid health, safety, environmental, design, open space, or other Local Concern which supports [the] denial" and "outweighs the regional Housing Need." 760 Code Mass. Regs. § 56.07(2)(b)(2) (2008). We turn to each issue raised by the board, keeping in mind the heavy burden borne by the board and the rebuttable presumption that there exists a substantial regional housing need that outweighs local concerns where, as here, the town has not achieved the ten percent minimum stock of affordable housing. *Zoning Bd. of Appeals of Canton*, 76 Mass. App. Ct. at 470.

a. *Environmental contamination.* State law prohibits development of the locus for construction of residential units in its current contaminated condition. Neither party argues that the judge erred in finding that the locus must achieve the condition of no significant risk under the MCP before development may begin. The MCP's requirements cannot be waived under the Act, and the MCP is designed to protect the health and safety of the public. While the board's concern for the health of the future occupants of the locus and its abutters cannot be doubted, the board does not point to a local by-law that requires more stringent cleanup than the DEP. In fact, the board does not point to any local by-law or regulation that controls either the remediation or development of contaminated property. The board's power to disapprove a comprehensive permit, like its power to impose conditions in issuing a comprehensive permit, *Zoning Bd. of Appeals of Amesbury* v. *Housing Appeals Comm.*, 457 Mass. at 755-756, is limited to the scope of concern of the various local

---

other issues, which will not undergo State review, the board's function would be thwarted without more definite plans, but that is not the case here. We note further that the board is not without recourse should State review result in substantial changes to the plans. The board will have an opportunity to review any "substantial changes" to the plans. 760 Code Mass. Regs. § 56.05(11)(a) (2008) ("If after a Comprehensive Permit is granted by the Board, including by order of the Committee pursuant to 760 Code Mass. Regs. § 56.07[5], an Applicant desires to change the details of its Project as approved by the Board or the Committee, it shall promptly notify the Board in writing, describing such change"). Should the board determine that a change is substantial, the board must hold a public hearing and determine anew whether the project may be approved with the change. 760 Code Mass. Regs. § 56.05(11)(c) (2008).

boards in whose stead the local zoning board acts. We agree
with the HAC, therefore, that the board exceeded its authority
in relying on environmental issues to deny the comprehensive
permit.

In an effort to bring the environmental issues within its scope
of concern, the board points to two use regulations of the town's
zoning by-law, §§ I-D(1)[10] and V-N,[11] as set forth in the mar-
gin. Section I-D(1) prohibits uses that will, among other things,
discharge into the soil or water any "petroleum products, chem-
icals or pollutants unless the same are so treated before discharge
as to render them harmless to life or vegetation of any kind."
Similarly, § V-N(2) prohibits discharge into the ground or water
of substances that may combine with others to create offensive
elements unless the discharge is "in accordance with applicable
federal, state and local health and water pollution control laws
and regulations." Both the HAC and the judge correctly rejected
the board's argument that these use regulations were intended to
apply to the remediation of the locus in this case. The clear
import of these restrictions is to prevent uses that will produce
or allow the disposal of products that will contaminate the soil
and water; they do not prevent efforts to clean up existing
contamination. We note in addition that nothing in GVR's sub-
mittals suggest that it plans to discharge HRC into the ground-
water "except in accordance with applicable federal, state and
local health and water pollution control laws and regulations."

[10]Section I-D(1) of the town's zoning by-law provides that "[i]n any district
no use will be permitted which will produce a nuisance or hazard from fire or
explosion, toxic or corrosive fume, gas, smoke, odors, obnoxious dust or
vapor, harmful radioactivity, offensive noise or vibration, flashes, objection-
able effluent or electrical interference which may affect or impair the normal
use and peaceful enjoyment of any property, structure, or dwelling in the
neighborhood. Neither shall there be permitted any use which discharges into
the air, soil, or water any industrial, commercial or other kinds of wastes,
petroleum products, chemicals or pollutants unless the same are so treated
before discharge as to render them harmless to life or vegetation of any kind."

[11]Section V-N(2) of the town's zoning by-law provides that "[n]o discharge
at any point into any public sewer, private sewerage disposal system, stream,
water body, or into the ground, of any materials of such nature or temperature
as can contaminate such water body or water supply, or cause emission of
dangerous offensive elements in reaction thereto, shall be permitted except in
accordance with applicable federal, state and local health and water pollution
control laws and regulations."

To the extent that these sections of the town's zoning by-law may be interpreted to control the introduction of HRC into the property for purposes of remediating the site, GVR's expert's testimony indicates that "remedial activities that could potentially generate [vinyl chloride] [by the combination of TCE and HRC] will be routinely assessed, managed, and fully regulated under the MCP and other regulations to ensure that impact[s] [on] adjacent and future on-site residents, nearby surface water and other sensitive receptors will not occur." Moreover, GVR's expert testified that HRC has been used elsewhere in the town without objection. Given assurances that the impacts will be monitored and remediation activities will be regulated under the MCP by the DEP, along with the town's history of allowing the use of HRC elsewhere, the board has not shown that it has raised an issue of local concern that exceeds the need for affordable housing. It is not enough to identify a local by-law that arguably applies to the project; the board must show that the local concern outweighs the regional need for affordable housing. In addition, where the DEP is charged with providing for the protection of health, safety, public welfare, and the environment by ensuring that responsible owners take appropriate remediation action, the board must be able to demonstrate that its local concerns will not be met by the State standards enforced by the DEP. The board does not argue that the DEP will be unable to provide adequate protection to current and future residents.

b. *Wetlands.* To the extent the board argues that it reasonably denied the comprehensive permit because the plans do not comply with the WPA, the argument is unavailing. GVR's proposal commits to comply with the WPA, and the final plans are subject to conservation commission and DEP review prior to commencing any work in the areas protected by the WPA.[12] Moreover, as the judge correctly concluded, there was substantial evidence in the record to "sufficiently demonstrate that once the project is complete, the wetland resources on the property will be enhanced."

---

[12]The comprehensive permit statute does not exempt GVR from complying with the wetlands protection standards contained in the WPA and does not remove the conservation commission's jurisdiction to review the plans for compliance with the WPA. If the conservation commission determines that the plans do not comply with State standards, GVR has the option of pursuing a superseding order of conditions from the DEP.

420                    80 Mass. App. Ct. 406 (2011)

Zoning Board of Appeals of Holliston *v.* Housing Appeals Committee.

The town, however, has adopted a wetlands by-law that is stricter than the WPA in that it has a strict fifty-yard no disturb buffer zone and regulates small, isolated wetlands. GVR has requested a waiver from all the provisions of the local wetlands by-law to the extent they are stricter than the WPA. It was incumbent on the board, therefore, to identify a local interest protected by those aspects of the by-law that are stricter than the WPA and demonstrate that such interest outweighs the regional need for low and moderate income housing.

The board has done nothing more than point out that the proposal violates the town's stricter by-law. It has failed to demonstrate that the safeguards the local by-law provides to wetlands interests over and above the protections afforded by the WPA outweigh the community's need for low or moderate income housing. Wetland C, protected only by the local by-law and not by the WPA, will be made deeper and larger, and in doing so, the wetland vegetation will be removed and then re-planted. Although the board objects to what it describes as the "complete destruction" of this locally protected isolated wetland, it ignores the fact that wetland C served as a dumping ground for old tree stumps and is currently degraded. There is substantial evidence in the record to support the conclusion that wetland C's function will be enhanced by the project.

The board insists nonetheless that it or the conservation commission is charged with determining whether a resource area is "worthy" of protection, not GVR. The board's response is inadequate. "To the extent that a city or town does not have an adequate supply of affordable housing (measured in the Act as a percentage of existing housing or of land in each town) its local autonomy in zoning matters is curtailed." *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. 811, 824 (2002). It is not enough to simply point out a lack of compliance with local regulations or complain that the local board's power has been taken away. The board must show that the impacts on the local wetlands outweigh the local need for affordable housing, and it quite simply made no effort to do so.

Similarly, the board failed to articulate specific harms from the violation of the fifty-foot no disturb zone, particularly where the area will be disturbed only to create storm water basins that will be converted to additional wetlands. The board's expert

does suggest that by excavating the denuded slope adjacent to wetland area A/D and constructing a large storm basin in its place, animals may not be able to reach the wetland. The testimony on this point was vague, without identification of specific species that would be affected. Further, the plan calls for restoring a significant area of the buffer zone along the eastern edge of wetland area A/D and there is no plan to disturb the forested area adjacent to the wetlands, likely a significant animal habitat. Moreover, the HCA credited testimony that the improved wetlands system will provide additional habitat for wildlife. Most importantly, a stated purpose of the WPA is to protect animal habitats. There has been no showing that to the extent the board has identified a legitimate concern, the WPA will provide insufficient protection of local wild animal habitats, including that of those animals who need to reach the wetlands.

Finally, the board ignores that at least portions of the wetlands are currently contaminated and, so far as the record reveals, will remain so if the project is not approved. The HAC's conclusion that the over-all effectiveness and cleanliness of the wetlands will be improved by the project as proposed is supported by substantial evidence. It is difficult to escape the conclusion that the benefits to the wetlands from the proposed project greatly outweigh the proposed deviation from the stricter local by-law.

c. *Stormwater management.* The comprehensive permit is conditioned on submission of a stormwater management plan that complies with State requirements. The town has adopted local stormwater and runoff regulations that exceed the DEP requirements in that they require that the total volume and rate of runoff discharged offsite may not increase from predevelopment amounts. In addition, the regulations require retention pond slopes "be no steeper than 4 horizontal to 1 vertical." We agree with the HAC that the board has failed to demonstrate any harm from GVR's request for waivers from the local drainage regulations. Once again, the board simply points out that the local regulations will be violated. The board's concerns that discharging rainwater into the large pond may cause contaminated groundwater to spread ignores that remediation of the locus, including the groundwater, must occur before development may begin and that the site will continue to be monitored. As a result,

it cannot be said on this record that the board has demonstrated that a local concern with regard to stormwater management exceeds the need for low or moderate income housing.

d. *Housing need.* Although the board concedes that the town has not achieved the goal of ten percent affordable housing stock, it argues that in balancing its local concerns as to site contamination, wetlands alteration, and stormwater management with the regional need for housing, its failure to reach the ten percent goal should be given little weight because the need for the type of housing that the project will provide is low. We disagree.

The Act broadly defines "low or moderate income housing" as "any housing subsidized by the federal or state government." G. L. c. 40B, § 20, added by St. 1969, c. 403, § 5. The Act and associated regulations encourage the development of a mix of types of housing, including "rental [and] homeownership . . . for families, individuals, persons with special needs, and the elderly." 760 Code Mass. Regs. § 56.03(4) (2008). Although only fifty of the 200 proposed units here will qualify as affordable housing units, "[a]ll affordable housing projects are treated in the same manner regardless whether they include units to be made available at fair market value." *Board of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. at 824 n.25. Moreover, although the board presented evidence to support the conclusion that the region's greatest need is rental housing for very low income families, those that have incomes below thirty percent of the area median income, the board's witness did not go so far as to say that there is not a need for the owner owned and occupied type of affordable housing that will be provided by this project or even that the need for such housing is low. Indeed, with a subsidized housing stock of only 3.15 percent, the board's suggestion that the project will not contribute to the regional need for affordable housing is unavailing.

*Conclusion.* The record establishes that the decision of the HAC is supported by substantial evidence. The judgment upholding the HAC's decision is therefore affirmed.

*So ordered.*