APPEALS COURT 
 
 ZONING BOARD OF APPEALS OF BRAINTREE vs. 383 WASHINGTON STREET, LLC, & others[1] (and a consolidated case[2])

 
 Docket:
 23-P-1213
 
 
 Dates:
 February 13, 2025 – June 18, 2025
 
 
 Present:
 Englander, Hodgens, & Smyth, JJ.
 
 
 County:
 Norfolk
 

 
 Keywords:
 Zoning, Comprehensive permit, By-law, Housing appeals committee, Low and moderate income housing, Board of appeals: decision. Permit. Housing. Practice, Civil, Zoning appeal. Statute, Construction. Administrative Law, Agency's interpretation of regulation.
 
 

       Civil actions commenced in the Superior
Court Department on April 14, 2022.  
      The cases were heard by Joseph F.
Leighton, Jr., J., on motions for judgment on the pleadings.
      Roger L. Smerage (Carolyn M. Murray also
present) for the plaintiff.
      Peter L. Freeman for 383 Washington
Street, LLC.
      John R. Hitt, Assistant Attorney General,
for Department of Housing and Community Development & another.
      ENGLANDER, J.  This case involves applications for
comprehensive permits under G. L. c. 40B.  The applicant, 383 Washington Street, LLC
(developer), seeks to develop two adjacent properties in Braintree -- proposing
on one property an eight-unit townhouse, and on the other, a seventy-unit
apartment building.  Certain of the units
in each development will be dedicated for low or moderate income housing.  The developer invoked chapter 40B in an
attempt to streamline the local permitting process.  See the Comprehensive Permit Act, G. L.
c. 40B, §§ 20-23.  That effort initially failed, as the zoning board
of appeals of Braintree (board) denied the comprehensive permits.  The denials were thereafter reversed on
appeal by the housing appeals committee (HAC), so as the case reaches this
court, the board has been ordered to issue the comprehensive permits.
      The case presents issues, in particular,
regarding how to calculate the so-called "safe harbor" under
G. L. c. 40B, § 20, that is afforded to cities and towns that
achieve a 1.5 percent threshold for land area dedicated to low or moderate
income housing (sometimes called the "general land area minimum" or
"GLAM" provision).  See
G. L. c. 40B, § 20; 760 Code Mass. Regs. § 56.03(3)(b)
(2012).  In the proceedings below the
board took the position that the town of Braintree (town or Braintree) had
satisfied the statutory "safe harbor," and that accordingly any denial
of the comprehensive permits by the board must be upheld as a matter of
law.  On appeal, the HAC denied the
board's claim to the safe harbor, and thereafter ruled that the permits must
issue.  A Superior Court judge upheld the
HAC decisions.
      On appeal to this court the board
continues to press that it had achieved the 1.5 percent threshold, thereby
validating the denial of the comprehensive permits as a matter of law.  The board also argues, in the alternative,
that the permits were properly denied based upon Braintree land use regulations
that were "consistent with local needs" -- in particular, that the
proposed projects failed to comply with open space, or "open recreational
space," requirements, and that one project failed to make adequate provision
for fire safety.
      As discussed below, we affirm the rulings
of the HAC (and the Superior Court judge). 
Braintree did not establish that it qualified for the 1.5 percent safe
harbor, nor do we perceive error in the HAC's rejection of the board's denials
based upon open space and fire safety concerns.
      Background.  In February of 2017, the developer applied to
the board for two comprehensive permits, proposing two developments on adjacent
parcels of land in Braintree.  The first
development would constitute eight townhouse-style units in two buildings, of
which two units would be designated as low or moderate income housing
(townhouse project).  The second
development would constitute an apartment building with seventy units, of which
eighteen would be low or moderate income (apartment project).
      In March of 2017, the board asserted that
denying the comprehensive permits would be "consistent with local needs as
a matter of law," because Braintree met the 1.5 percent safe harbor.  The developer successfully challenged this
assertion before the Department of Housing and Community Development
(department),[3] and the board took an interlocutory appeal to the HAC.  Before the HAC, the board claimed that low or
moderate income housing existed on sites comprising 1.65 percent of the total
applicable land area in Braintree. 
However, the parties disputed the board's GLAM calculation -- both the
numerator (the land area containing low or moderate income housing) and the
denominator (the total applicable land area).  The HAC ultimately found that low or moderate
income housing existed on just 1.396 percent of the total applicable land area
and denied the board's claim.
      The board then resumed consideration of
the permits.  In February of 2020, the
board denied the comprehensive permits as inconsistent with local
standards.  The board gave several
justifications, including that (1) both developments did not offer
adequate "outdoor recreational areas" for residents, and (2) the
apartment project would not provide adequate access for firefighters.[4]
      On appeal, the HAC again reversed the
board.  While the HAC found that both
projects did not comply with the town's open space bylaw, it also found that
the bylaw had not been applied equally to subsidized and unsubsidized housing,
and thus that the board could not rely on it. 
The HAC also rejected the board's conclusion that the apartment project
failed to meet local fire safety requirements. 
The board sought judicial review of the HAC's decisions in the Superior
Court, which affirmed all decisions.
      Discussion.  1.  The
1.5 percent "safe harbor" issue. 
On appeal the board reiterates its position that Braintree satisfied the
1.5 percent GLAM "safe harbor" provision of chapter 40B.  See G. L. c. 40B, § 20.  The relevance of the GLAM provision is that,
if satisfied, a local zoning board's denial of a comprehensive permit is deemed
to be "consistent with local needs," as a matter of law, for chapter
40B purposes.  Id.  And under chapter 40B, a zoning board denial
that is "consistent with local needs" is conclusive with respect to
any review by the HAC, and may not be overturned by that body.  G. L. c. 40B, § 23.  See Zoning Bd. of Appeals of Sunderland v.
Sugarbush Meadow, LLC, 464 Mass. 166, 169 & n.3 (2013) (Sugarbush) (HAC hearing
limited to whether appeal board decision denying permit was consistent with
local needs).  As discussed below,
however, we agree with the HAC that Braintree did not meet the GLAM
requirements.
      The basic structure of chapter 40B has
been described in previous cases, and we reiterate it only briefly here.  An applicant under chapter 40B must show that
its proposed project is eligible to be subsidized under a government low or
moderate income housing program. 
G. L. c. 40B, §§ 20, 21; 760 Code Mass. Regs.
§ 56.04(1) (2012).  Assuming that
the project qualifies, the developer may utilize the vehicle of chapter 40B,
which among other things (1) vests in the town's zoning board of appeals
the ability to grant a "comprehensive permit" for the development, without
the developer having to separately obtain approval from other town boards --
e.g., the planning board or the conservation commission, and (2) imposes
limits on the board's ability to deny the comprehensive permit -- that is, the
denial must be "reasonable and consistent with local needs."  See G. L. c. 40B, §§ 21, 23;
Board of Appeals of Hanover v. Housing Appeals Comm., 363 Mass. 339, 364 (1973)
(board of appeals to apply same "consistent with local needs"
standard as HAC).
      As noted, here the board contends that it
has conclusively met the "consistent with local needs" requirement,
because the town qualifies for a "safe harbor" based upon the amount
of land area in the town that is already dedicated to low or moderate income housing.  The HAC, however, found to the contrary.  As always, we begin with the statutory
language:
"Requirements
or regulations shall be consistent with local needs when imposed by a board of
zoning appeals . . . in a city or town where (1) low or moderate
income housing exists . . . on sites comprising one and one half per
cent or more of the total land area zoned for residential, commercial or
industrial use . . ." (emphasis added).
G. L.
c. 40B, § 20.
      The above language sets forth what appears
to be, at least at first blush, a simple mathematical ratio.  The numerator is the "total land
area" in a town that consists of "sites" where "low or
moderate income housing exists." 
G. L. c. 40B, § 20. 
The denominator is the "total land area" in a town that is
"zoned for residential, commercial or industrial use."  Id.  If
the ratio is equal to or greater than 1.5 percent, then the town achieved its
GLAM safe harbor.
      As is sometimes the case, the difficulty
with applying the statute is in the details. 
By way of example, in calculating the "total land area" in a
town that is zoned for residential, commercial, or industrial use, does one
include water bodies (viz., lakes, ponds, rivers), that are included in a zone
on a town zoning map but where no building could occur?  If those areas are included in the
denominator, then it will be more difficult (potentially, considerably more
difficult) for the town to meet the GLAM safe harbor.  It turns out, however, that water bodies are
excluded from the denominator by regulation. 
See 760 Code Mass. Regs. § 56.03(3)(b)(5).
      Similar interpretive issues arise for the
numerator.  Suppose, for example, that
only ten percent of the units in a particular development in the town have been
set aside for low or moderate income housing. 
Does one count the "total area" of the "site" where
the housing "exists" (that is, the entire area of the development) or
only ten percent of that area (or some other percentage)?  Once again, the regulations address this
question (the answer is ten percent), see 760 Code Mass. Regs.
§ 56.03(3)(b), but the examples demonstrate the need for further
elucidation of the statutory language. 
Indeed, there are a host of variants and issues that can arise in
applying the statutory language, several of which have been raised during this
litigation, including in this appeal.[5] 
The regulations address many of these variants and answer a great number
of questions.  Moreover, the department
has also issued "guidelines" that provide further detail in applying
the GLAM ratio, although the board contends the guidelines are invalid and may
not be considered as law.[6]  As
discussed below, we can resolve the dispute before us by reference to the
statutory language and the regulations only, without having to resolve the
viability of the department guidelines. 
Cf. Attorney Gen. v. Milton, 495 Mass. 183, 193-196 (2025).
      Turning to the facts of this case, before
the HAC the parties raised several disagreements that bore on the GLAM
calculation, including disagreements regarding both the numerator and the
denominator.[7]  On appeal to this court
those disagreements have been narrowed; indeed, it turns out that we can
resolve the GLAM question by resolving a single disagreement, which is whether
a certain 244-acre area that was part of the so-called "Devon Woods"
development should, or should not, be included in the denominator of the GLAM
calculation.
      The Devon Woods development is a so-called
"cluster" development that Braintree approved in the 1980s.  Pursuant to the Braintree zoning bylaws
applicable to such developments, the developer was required to set aside
certain land area and dedicate it, permanently, to conservation uses.  The 244 acres at issue are the result of this
process.  The land is located within an
area zoned for residential use.  However,
the land is permanently dedicated to use for conservation purposes.  It may not be built on.  The board argues, accordingly, that the land
logically should be excluded from the denominator of the GLAM calculation, just
as water bodies are excluded, because the land is not available for
development.  Importantly, the board
concedes that if these 244 acres are included in the denominator, Braintree
cannot reach the 1.5 percent GLAM threshold even if it succeeds on every
argument that it raised for increasing the calculated numerator -- that is,
Braintree cannot succeed even if the numerator reached the figure of 81.859
acres of "sites" where "low or moderate income housing
exists," as the board claimed before the Superior Court.[8]
      The board's Devon Woods argument founders
on the plain language of the statute, as well as the language and structure of
the applicable regulation, 760 Code Mass. Regs. § 56.03(3)(b).  Starting with the statute, the land at issue
is "zoned" "residential." 
It accordingly falls squarely within the definition of the denominator
-- land area "zoned for residential, commercial or industrial
use."  G. L. c. 40B,
§ 20.  If the statute were the last
word on the issue, then the answer would be clear as day; the regulation, however,
puts a gloss on the statutory language. 
The regulation at issue establishes that some land area that is zoned
residential, commercial or industrial (for example, water bodies) may
nevertheless be excluded from the denominator. 
See 760 Code Mass. Regs. § 56.03(3)(b)(5).
      The relevant regulation, 760 Code Mass.
Regs. § 56.03(3)(b), is entitled "General Land Area Minimum,"
and begins:  "For the purposes of
calculating whether [low and moderate income housing] exists in the city or
town on sites comprising more than 1 1/2% of the total land area zoned for
residential, commercial, or industrial use . . . ."  Then follow several numbered paragraphs as to
categories that should be "included," or "excluded," from
the "total land area" calculation:
"1.  Total land area shall include all districts
in which any residential, commercial, or industrial use is permitted,
regardless of how such district is designated by name in the city or town's
zoning bylaw;
"2.  Total land area shall include all unzoned land
in which any residential, commercial, or industrial use is permitted;
"3.  Total land area shall exclude land owned by
the United States, the Commonwealth or any political subdivision thereof, the
Department of Conservation and Recreation or any state public authority, but it
shall include any land owned by a housing authority and containing [low or
moderate income housing];
"4.  Total land area shall exclude any land area
where all residential, commercial, and industrial development has been prohibited
by restrictive order of the Department of Environmental Protection pursuant to
[G. L.] c. 131, § 40A.  No
other swamps, marshes, or other wetlands shall be excluded;
"5.  Total land area shall exclude any water
bodies;
"6.  Total land area shall exclude any flood
plain, conservation or open space zone if said zone completely prohibits
residential, commercial and industrial use, or any similar zone where
residential, commercial or industrial use are completely prohibited.
"7.  No excluded land area shall be counted more
than once under the above criteria." 
(Emphases added.)
760 Code Mass.
Regs. § 56.03(3)(b)(1)-(7).
      The board argues that the Devon Woods land
area should be excluded under subsection 4 and subsection 6 of the above
provision, but we do not agree.  As to
subsection 4, it plainly does not apply. 
That subsection excludes only land area subject to a "restrictive
order of the Department of Environmental Protection [(DEP)] pursuant to
[G. L.] c. 131, § 40A," which is a particular kind of DEP
order protecting "inland wetlands." 
See G. L. c. 131, § 40A. 
The 244 acres are not subject to a § 40A order; rather, they are
subject to a conservation restriction, a concept that is defined and discussed
in a different section of the Massachusetts statutes, G. L. c. 184,
§§ 31-33.[9]  See Zoning Bd. of
Appeals of Greenfield v. Housing Appeals Comm., 15 Mass. App. Ct. 553, 559
(1983) (in construing regulations with regard to G. L. c. 40B, "[a]
reasonable regulation of an administrative agency which is clear and
unambiguous on its face must, like a comparable statute, be applied according
to its terms").
      Nor does subsection 6 apply.  By its terms, that subsection excludes
conservation "zone[s]."  760
Code Mass. Regs. § 56.03(3)(b)(6). 
The 244 acres do not fall in a conservation "zone" on the town
zoning map; the land at issue is zoned residential.  The town argues, however, that the subsection
6 exclusion should not be limited to land that is zoned for conservation on a
zoning map, but instead that we should give the word "zone" a broader
construction, and that the 244 acres would fit, for example, the dictionary
definition of "zone" as "a region or area set off as distinct
from surrounding or adjoining parts." 
See Merriam-Webster's Collegiate Dictionary 1458 (11th ed. 2005).  The town also argues that a broader
construction is appropriate because subsection 6 uses only the word
"zone," not "zoning district."  And finally, the town points to the language,
"or any similar zone where residential, commercial or industrial use are
completely prohibited," and contends that the 244 acres constitute a
"similar zone" that meets this arguably more general language.  760 Code Mass. Regs. § 56.03(3)(b)(6).
      We are not persuaded.  In the context of the regulation, we conclude
that the proper construction of "zone" is in reference to the
applicable government zoning map.  That
is the context in which the word is used in subsection 2 of § 56.03(3)(b);
similarly, subsection 1 is clearly directed at determining what land should be
included or excluded based upon the zoning map. 
760 Code Mass. Regs. § 56.03(3)(b)(1).  We note as well that each of subsections 1
through 5 involve land areas that appear to be determinable from information
ordinarily available to the town -- for example, what land is owned by
particular government entities or covered by a water body.  In contrast, if subsection 6 were read
broadly, as the board urges, then determining what land area should be excluded
as falling within a "conservation or open space zone" would be more
difficult -- arguably requiring, for example, a consultation or compilation of
private deed restrictions (and perhaps even legal opinions) to determine
whether land had been set aside for "conservation" or "open
space."  Put differently, if
"zone" in subsection 6 is not referring to the town's zoning map,
then one might argue that every land area in town dedicated to some form of
"open space" is arguably excludable, no matter how it was designated
on the zoning map.[10]  In short, the
board's construction is very broad, and its limits are not easily discerned.
      As discussed above, the regulatory
exclusions of § 56.03(3)(b) are already in tension with the plain language
of the statute, G. L. c. 40B, § 20.  In addition, the exclusions make it easier
for towns to meet the GLAM safe harbor, and thereby to avoid the application of
the strict requirements of chapter 40B. 
We are not inclined to read the exclusion in subsection 6 broadly, thereby
increasing the tension with the statute in a manner that could be, in addition,
difficult to apply and to administer.[11] 
Rather, we read the word "zone" in subsection 6 to refer to
zones on a government zoning map.  760
Code Mass. Regs. § 56.03(3)(b)(6). 
As a result, the 244 Devon Woods acres should not be excluded from the
denominator of the GLAM calculation, and Braintree did not qualify for the GLAM
safe harbor.
      2. 
Braintree's proffered "valid local concerns."  That Braintree did not meet the 1.5 percent
GLAM threshold is not the end of this matter, because the board also denied the
comprehensive permit based on supposed "valid [l]ocal [c]oncern[s]"
-- (1) as to both the townhouse and apartment projects, that they failed
to provide sufficient "outdoor recreational areas," and (2) as
to the apartment project, that it failed to provide adequate access for
firefighting.  See 760 Code Mass. Regs.
§ 56.02 (2020) (defining "Consistent with Local Needs," in part,
as when "Local Requirements and Regulations imposed on a Project are
reasonable . . . considered with . . . Local Concerns . .
.").  After an evidentiary hearing,
the HAC rejected both of these bases for denying the comprehensive permits,
ruling that the board had failed to meet the statutory standards for
denial.  On appeal, the board challenges
the HAC's rulings.
      a. 
The "outdoor recreational areas" issue.  As to the board's denial based upon
insufficient "outdoor recreational areas," the HAC's principal basis
for rejecting that concern was that outdoor recreational space is not a requirement
of the town zoning bylaws.  The HAC is
correct in this regard.  The bylaws
governing multifamily dwellings contain an express "open space"
requirement -- it is 2,000 square feet of open space per unit.  See Braintree Zoning Ordinances, art. VII, § 135-705
(2003).  The bylaws do not refer,
anywhere, to "outdoor recreational space."  The HAC accordingly rejected the board's
position, essentially as a matter of law, ruling that the board had failed to
establish a valid local concern.  The HAC
went on to note, in addition, that even if there were an articulated local
concern for outdoor recreational space, such a concern would be "minimal
with respect to the project site," because the proposed projects are
"within walking distance to several public outdoor recreational
facilities."
      We review the HAC's determination for
whether it was supported by substantial evidence, and not arbitrary or
capricious.  See G. L. c. 30A,
§ 14 (7); G. L. c. 40B, § 22; Zoning Bd. of Appeals of
Milton v. HD/MW Randolph Ave., LLC, 490 Mass. 257, 262 (2022).  The HAC's decision here was well
supported.  Under the statute, Braintree
can deny a comprehensive permit only if the denial is "reasonable and
consistent with local needs." 
G. L. c. 40B, § 23. 
Where, as here, a city or town does not qualify for a safe harbor, a
board requirement or regulation is "consistent with local needs" if
it is:
"reasonable
in view of the regional need for low and moderate income housing considered
with the number of low income persons in the city or town affected and the need
to protect the health or safety of the occupants of the proposed housing or of
the residents of the city or town, to promote better site and building design
in relation to the surroundings, or to preserve open spaces, and if such
requirements and regulations are applied as equally as possible to both
subsidized and unsubsidized housing" (emphases added).
G. L.
c. 40B, § 20.
      Here, where the HAC determined that the
town bylaws do not even address "outdoor recreational areas," it is
readily evident that the HAC's rejection of the board's requirement was not
arbitrary or capricious.  See Zoning Bd.
of Appeals of Holliston v. Housing Appeals Comm., 80 Mass. App. Ct. 406,
417-418 (2011) ("The board's power to disapprove a comprehensive permit
. . . is limited to the scope of concern of the various local boards
in whose stead the local zoning board acts").  Indeed, the board makes no argument that this
outdoor recreational space requirement is applied equally to subsidized and unsubsidized
housing, as there is no showing that the requirement has been applied generally
to projects in the town.[12]
      On appeal, the board contends that its
outdoor recreational space requirement is merely an implicit subset of the
"open space" requirement that is found in the town bylaws.  Braintree emphasizes that neither project
meets the open space requirement of 2,000 square feet per unit, and, in fact,
that both projects fall considerably short of that mark.  This argument fails for a different reason,
however, which is that the HAC expressly found that the board does not apply
the bylaws' open space requirement equally to subsidized and unsubsidized
housing.  This HAC finding was supported
by an analysis of four other unsubsidized housing projects in Braintree (in the
case of the townhouse project) and six other unsubsidized projects (in the case
of the apartment project) that had been approved even though they did not meet
the bylaws' 2,000 square feet requirement. 
Notably, several of these previously approved, unsubsidized projects had
open space area comparable to the projects at issue.
      In short, the HAC's conclusion as to the
bylaws' "open space" requirement was supported by substantial
evidence and not arbitrary or capricious. 
The HAC's conclusion as to the outdoor recreational space variant on
"open space" was equally well supported in the record and is
accordingly affirmed.
      b. 
The fire safety issue for the apartment project.  As to fire safety, before the HAC the board
argued that the apartment project was out of compliance with the National Fire
Protection Association (NFPA) 1 Code, relying on the testimony of the Braintree
deputy fire chief that fire access to the apartment project would be
insufficient, and that there would be operational concerns in the event of an
emergency.[13],[14]  After an evidentiary
hearing at which the deputy fire chief testified, however, the HAC found that
none of the board's fire safety concerns constituted a valid local concern
sufficient to deny the comprehensive permit.
      The HAC's decision as to fire safety was
supported by substantial evidence and was not arbitrary or capricious.  The board argues that the developer did not
establish a prima facie case of compliance with State regulations, alleging
that one of the two fire access roads, the "Parking Way," would not
be "unobstructed" as required by the applicable NFPA 1 Code, because
vehicles could park there.[15]  See 527
Code Mass. Regs. 
§§ 1.04, 1.05
(2022); NFPA 1 Fire Code § 18.2.3.5.1.1 (2021); 760 Code Mass. Regs.
§ 56.07(2)(a)(2) (2012).  However,
there was evidence in the record, which the HAC relied upon and credited, that
the likelihood that cars would obstruct access on the "Parking Way"
was not abnormally high.  Furthermore,
there was evidence that the fire department could require the installation of
signs on the "Parking Way" indicating that parking was prohibited.
      The board argues that the developer could
not be in compliance with the fire code where the deputy fire chief determined
that another access road would be needed, in addition to the two fire access
roads already available.  The board bases
this challenge on an NFPA 1 Code provision in effect at the time, which
provided that "[m]ore than one fire apparatus access road shall be provided
when it is determined by the [fire chief] that access by a single road could be
impaired by vehicle congestion . . . or other factors that could
limit access."  NFPA 1 Fire Code
§ 18.2.3.3 (2021).  See 527 Code
Mass. Regs. §§ 1.04, 1.05.  Although
the development already had two fire access roads, the board argues that where
the deputy fire chief has determined that another fire access road would be
required, the HAC must defer to that determination essentially as a matter of
law.  However, the deputy fire chief's
recommendation is not binding on the HAC in the chapter 40B context, where the
deputy fire chief is treated as a "local . . . official"
whose approval is not required to obtain a comprehensive permit.  See Sugarbush, 464 Mass. at 182-183, quoting
G. L. c. 40B, § 21. 
Accordingly, the HAC had "the authority to evaluate the fire
chief's recommendation in the context of the comprehensive permit," and
could permissibly determine that the project was in compliance with the State
fire code based on the evidence in the record. 
See Sugarbush, supra at 183. 
Here, the HAC did so; it pointed out that the apartment project already
had two access roads available, and that access met the specific requirements
of the State fire code.
      The board's other supposed "local
concern" related to fire safety is founded solely in the opinion of the
deputy fire chief, who testified that "[i]t is the position of the
Braintree Fire Department that the proposed design and size of the building in
relation to the size of the lot and the location of the site provide inadequate
fire access creating a serious public safety concern," and identified
several access concerns.  However, the
developer's expert, a fire protection engineer, provided testimony that the
project was compliant with the fire code, and that the project did not present
an unusual fire hazard such that further protections would be necessary.[16]  The HAC expressly found the developer's
expert's testimony more credible than that of the deputy fire chief.  Such credibility determinations are the
province of the HAC.  See Sugarbush, 464
Mass. at 184.
      The judgments entered on docket numbers
2282CV00344 and 2282CV00345 are affirmed.
So ordered.

footnotes

[1] Department of
Housing and Community Development and the Housing Appeals Committee.

[2] The
consolidated case involves the same parties.

[3] The
department is now named the Executive Office of Housing and Livable
Communities.  See Attorney Gen. v.
Milton, 495 Mass. 183, 187 n.7 (2025).

[4] The board
also reasserted that 1.5 percent of Braintree's general land area was dedicated
to low or moderate income housing.  The
board found additional concerns with the project, which are not at issue in
this appeal.

[5] For example,
the board argues that certain land areas associated with low and moderate
income housing units should be included as part of the numerator, including
stormwater infrastructure, landscaped areas, and zoning setbacks.  As we note below, we do not reach these
issues.

[6] The
guidelines at issue in this case were issued in January of 2018, during the
pendency of the interlocutory appeal to the HAC, and were revised in late
January 2020, shortly before the board denied the comprehensive permits as
inconsistent with local standards.

[7] Before the
HAC, the board took the position that the denominator should be calculated as
5,120.97 acres of land area zoned residential, commercial or industrial, with a
numerator of 84.517 acres of low or moderate income housing "sites,"
for a ratio of 1.65 percent.  The
developer disagreed, and the HAC ultimately settled on a denominator of
5,498.27 acres, a numerator of 76.768 acres, and a ratio of 1.396 percent,
below the statutory threshold.

[8] We reject the
board's argument that a GLAM ratio that is over 1.45 percent may be
"rounded up," to reach the GLAM threshold.  Such an argument is inconsistent with the
plain language of the statute, which sets the minimum at "one and one half
per cent or more."  G. L.
c. 40B, § 20.

[9] General Laws
c. 184, §§ 31-33, "created a framework to protect conservation
lands . . . through the use of what are essentially negative
easements."  Wildlands Trust of
Southeastern Mass., Inc. v. Cedar Hill Retreat Ctr., Inc., 98 Mass. App. Ct.
775, 776 (2020).  "The grantor
maintains possession but grants a nonpossessory interest in the property to a
holder -- generally a government entity or charitable organization -- which
agrees to protect the natural aspects of the property."  Id.

[10] We note that
cities or towns may file with the appropriate register of deeds a map, known as
the public restriction tract index, including, among other restrictions,
conservation restrictions.  G. L.
c. 184, § 33.  The preparation
and filing of such a map is permissive, however, not mandatory, as is the
reporting of any such restriction.  See
id.

[11] We do not
call into question the validity of the GLAM regulations; we merely decline to read
subsection 6 broadly, as the town urges.

[12] The board
argues that a valid local concern regarding open recreational space can be
found within the town's open space and recreation plan, contained within its
master plan, which includes the objective to "[p]rovide for increased
opportunities for active recreation." 
The HAC found, however, that "[t]he Master Plan does not contain
any recommendations that the Town impose outdoor recreational facilities on
private developments."

[13] Braintree
does not have any local fire safety regulations, beyond the State fire code.

[14] The
provisions of the NFPA 1 Code have been adopted, incorporated, and modified by
regulation in Massachusetts.  See 527
Code Mass. Regs. §§ 1.04, 1.05 (2022). 
At the time of the March 2022 HAC decision, the 2021 edition of the NFPA
1 Code was in effect.  

[15] Before the
HAC, the board also argued other fire access concerns; these concerns were
rejected by the HAC, and the board does not press these arguments on appeal.

[16] The board
argues that as to one operational concern, the use of a "grass-crete"
pad as a staging ground for an aerial ladder truck, both parties agreed that
the pad was not an ideal location for such a use.  But the HAC found that there were other areas
around the building where such a truck could be deployed, and any risk posed by
an inability to park the town's aerial ladder truck on the grass-crete pad was
minimal in light of other planned safety features for the project.