ZONING BOARD OF APPEALS OF SUNDERLAND *VS.* SUGARBUSH
MEADOW, LLC, & another.[1]

Franklin. September 5, 2012. - January 14, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Housing. Zoning,* Housing appeals committee, Low and moderate income
housing, Comprehensive permit.

Discussion of the history, purpose, and operation of the Massachusetts
Comprehensive Permit Act, G. L. c. 40B, §§ 20-23, and discussion of the
legal standard applied by a court when reviewing a decision of the housing
appeals committee of the Department of Housing and Community
Development. [168-172]
A Superior Court judge properly upheld a decision of the housing appeals
committee (HAC) of the Department of Housing and Community Develop-
ment directing a town's zoning board of appeals (board) to issue a
comprehensive permit to a developer seeking to build five three-story
buildings with 150 rental apartments, where the HAC did not err in excluding
housing that was not subsidized by the Federal or State government (i.e.,
affordable, market-rate, unsubsidized housing) in weighing the regional
need for affordable housing, or in defining the appropriate region [172-178];
where substantial evidence supported the HAC's determination that the
board failed to meet its burden of establishing that a specific fire safety
concern outweighed the regional need for affordable housing [178-184];
where the HAC correctly determined that the adverse fiscal impact the
town would allegedly suffer could not be weighed [184-188]; and where
substantial evidence supported the HAC's determination that the board
failed to meet its burden of showing that the development would not
adequately protect wetlands [188-189]; further, the HAC did not err in
ordering the board to refund the fee it assessed the developer to pay for the
services of the board's legal counsel [189-192].

CIVIL ACTION commenced in the Superior Court Department on
July 19, 2010.

The case was heard by *Mary-Lou Rup*, J., on a motion for
judgment on the pleadings.

The Supreme Judicial Court granted an application for direct
appellate review.

[1]Housing Appeals Committee (HAC) of the Department of Housing and
Community Development (department).

*Jason R. Talerman* for the plaintiff.

*Peter L. Freeman* for Sugarbush Meadow, LLC.

*James S. Whitcomb*, Assistant Attorney General, for housing appeals committee.

The following submitted briefs for amici curiae:

*Walter R. Tibbetts*, pro se.

*Edward J. DeWitt* for Association to Preserve Cape Cod.

*Jeffrey W. Sacks, Kurt M. Mullen, & Troy K. Lieberman* for Citizens' Housing and Planning Association.

GANTS, J. Sugarbush Meadow, LLC (Sugarbush), filed an application for a comprehensive permit with the Sunderland zoning board of appeals (board) under G. L. c. 40B, §§ 20-23, to build five three-story buildings with 150 rental apartments (project). The board denied the application, and Sugarbush appealed the denial to the housing appeals committee (HAC) of the Department of Housing and Community Development (department). The HAC vacated the board's decision and directed the board to issue a comprehensive permit. The board appealed to the Superior Court under G. L. c. 30A, § 14, which affirmed the HAC's decision, and we granted the board's application for direct appellate review.

On appeal, the board claims that the HAC made five errors. First, the board contends that the HAC erred in concluding that the availability of low-cost, market-rate rental housing in the town of Sunderland (town) should not be considered in determining the regional need for low and moderate income housing, and in defining the region as the six-town area including and surrounding Sunderland. Second, the board argues that there was not substantial evidence to support the HAC's finding that the regional need for low and moderate income housing outweighed concerns regarding the safety of the future occupants of the proposed housing development in the event of fire (and of the fire fighters fighting such a fire). Third, the board claims the HAC erred in concluding that the town need not acquire a ladder fire truck if the project were built and that other more general claims of adverse fiscal impact arising from the project, such as increased educational, police, and fire fighting costs, may not be considered in evaluating whether the denial of project approval is consistent with local needs under

G. L. c. 40B, § 23. Fourth, the board maintains that the HAC erred in concluding that Sugarbush established a prima facie case that the project complies with the town's wetlands bylaw. Fifth, the board argues that the HAC erred in ordering the board to refund the $10,000 fee it assessed Sugarbush to pay for the services of the board's legal counsel. We address each claim in turn and affirm the judgment of the Superior Court affirming the HAC's decision.[2]

*Legal background and standard of review.* Before addressing the particular legal and factual issues before us in this case, we describe briefly the history, purpose, and operation of the Massachusetts comprehensive permit act, sometimes referred to as the anti-snob zoning act, G. L. c. 40B, §§ 20-23 (act). *Zoning Bd. of Appeals of Wellesley v. Ardemore Apartments Ltd. Partnership*, 436 Mass. 811, 814 (2002) (*Wellesley II*). See *Zoning Bd. of Appeals of Lunenburg v. Housing Appeals Comm.*, ante 38, 39-44 (2013). "We have long recognized that the Legislature's intent in enacting [the act] is 'to provide relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing' in the Commonwealth." *Standerwick v. Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 28-29 (2006), quoting *Board of Appeals of Hanover v. Housing Appeals Comm.*, 363 Mass. 339, 354 (1973). "The structure of the act itself reflects a 'careful balance between leaving to local authorities their well-recognized autonomy generally to establish local zoning requirements . . . while foreclosing municipalities from obstructing the building of a minimum level of housing affordable to persons of low income.' " *Zoning Bd. of Appeals of Amesbury v. Housing Appeals Comm.*, 457 Mass. 748, 763-764 (2010), quoting *Board of Appeals of Woburn v. Housing Appeals Comm.*, 451 Mass. 581, 584 (2008).

The act allows a public agency, or a limited dividend or nonprofit organization, that wishes to construct low or moderate income housing "to circumvent the often arduous process of applying to multiple local boards for individual permits and, instead, to apply to the local board of appeals for issuance of a single comprehensive permit." *Board of Appeals of Woburn v.*

---

[2]We acknowledge the amicus briefs of the Association to Preserve Cape Cod; the Citizens' Housing and Planning Association; and Walter R. Tibbetts.

*Housing Appeals Comm., supra* at 583, quoting *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 516 (2007). See G. L. c. 40B, § 21 (organization "may submit to the board of appeals . . . a single application to build such housing in lieu of separate applications to the applicable local boards"). "The zoning board is then to notify those 'local boards' for their 'recommendations' on the proposal; the zoning board may 'request the appearance' of representatives of those 'local boards' at the public hearing as may be 'necessary or helpful' to the decision on the proposal; and the zoning board may 'take into consideration the recommendations of the local boards' when making its decision." *Dennis Housing Corp.* v. *Zoning Bd. of Appeals of Dennis*, 439 Mass. 71, 77 (2003), quoting G. L. c. 40B, § 21. The zoning board has "the same power to issue permits or approvals as any local board or official who would otherwise act with respect to such application." G. L. c. 40B, § 21.

"If the board denies an application for a comprehensive permit, the developer may appeal to HAC." *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 656 (1982) (*Wellesley I*), citing G. L. c. 40B, § 22. When the HAC reviews the decision of a local zoning board of appeals to deny a comprehensive permit, "[t]he hearing . . . shall be limited to the issue of whether . . . the decision of the board of appeals was reasonable and consistent with local needs." G. L. c. 40B, § 23.[3] See 760 Code Mass. Regs. § 56.07(1)(b) (2012) ("In the case of the denial of a Comprehensive Permit, the issue shall be whether the decision of the Board was Consistent with Local Needs").

"Consistent with local needs" is a term of art under G. L. c. 40B, § 20, defined as follows:

> "[R]equirements and regulations shall be considered consistent with local needs if they are reasonable in view of the regional need for low and moderate income housing considered with the number of low income persons in the

---

[3] "[T]he term 'reasonable' is surplus verbiage which does not add any substance to the 'consistent with local needs' standard." *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 366 n.17 (1973).

> city or town affected and the need to protect the health or
> safety of the occupants of the proposed housing or of the
> residents of the city or town, to promote better site and
> building design in relation to the surroundings, or to
> preserve open spaces, and if such requirements and regula-
> tions are applied as equally as possible to both subsidized
> and unsubsidized housing."

The statute further provides that such requirements and regula-
tions "shall be consistent with local needs . . . where . . . low
or moderate income housing exists which is in excess of ten per
cent of the housing units reported in the latest federal decennial
census of the city or town or on sites comprising one and one
half per cent or more of the total land area zoned for residential,
commercial or industrial use." *Id.*

Under the regulations issued by the department to administer
the act, there is an "irrebuttable presumption" that a board's
decision to deny an application for a comprehensive permit is
"[c]onsistent with [l]ocal [n]eeds" where the board determines
that one or more of the grounds set forth in 760 Code Mass.
Regs. § 56.03(1) (2012) has been satisfied. 760 Code Mass.
Regs. § 56.07(3)(a), 56.07(2)(b)(1) (2012). One of these grounds
is that the town's subsidized housing inventory (SHI) exceeds
ten percent of the town's total housing units. 760 Code Mass.
Regs. § 56.03(1), 56.03(3)(a) (2012). Where this or any of the
other grounds in 760 Code Mass. Regs. § 56.03(1) is established,
the "HAC is without authority to order that board to grant a
comprehensive permit or to modify or remove conditions," and
the board's denial of an application must be affirmed. *Taylor* v.
*Housing Appeals Comm.*, 451 Mass. 149, 151-152 (2008) ("if a
municipality has reached the ten per cent threshold, and its zon-
ing board of appeals denies a developer's application, then the
application process is effectively terminated"); 760 Code Mass.
Regs. § 56.07(3)(a). There is no dispute that the town has failed
to prove any of these grounds.[4]

Where, as here, none of the grounds that would trigger a

___

[4]Another ground that creates an irrebuttable presumption is where the
project is a "large project," as defined in 760 Code Mass. Regs. § 56.03(6)
(2012). 760 Code Mass. Regs. § 56.03(1)(d) (2012). When the comprehensive

conclusive presumption is present, the regulations and our cases provide that there is "a rebuttable presumption that there is a substantial Housing Need which outweighs Local Concerns." 760 Code Mass. Regs. § 56.07(3)(a) (2012). See *Boothroyd* v. *Zoning Bd. of Appeals of Amherst*, 449 Mass. 333, 340 (2007), quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, *supra* at 367 ("municipality's failure to meet its minimum [affordable] housing obligations, as defined in § 20, will provide compelling evidence that the regional need for housing does in fact outweigh the objections to the proposal"). Where a town attempts to rebut this presumption, the board bears "the burden of proving, first, that there is a valid health, safety, environmental, design, open space, or other Local Concern which supports such denial, and then, that such Local Concern outweighs the Housing Need." 760 Code Mass. Regs. § 56.07(2)(b)(2) (2012). See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, *supra* ("In cases where the locality has not met its minimum housing obligations, the board must rest its decision on whether the required need for low and moderate income housing outweighs the valid planning objections to the details of the proposal such as health, site design, and open spaces").[5]

---

permit application in this case was filed with the board in 2006, the governing regulation defined a "large scale project" for a municipality, such as Sunderland, with less than 2,500 housing units, as a project that "involved construction of more than 150 housing units." 760 Code Mass. Regs. § 31.07(1)(g) (2004). The definition of a "large project" for a municipality with less than 2,500 housing units was later revised to include a project to build "a number of housing units equal to 6% of all housing units in the municipality," 760 Code Mass. Regs. § 56.03(6)(d) (2012), but the revised regulations expressly provided that this change in definition did not apply where an application for a permit had been filed with the board before the new regulations became effective. 760 Code Mass. Regs. § 56.08(3)(c) (2012). Because the project in this case proposed building precisely 150 housing units, and because the change to the definition of a "large project" did not apply, the project here did not qualify as a "large scale project."

[5]The regulations provide guidance as to how these considerations should be weighed in the balance:

"1. the weight of the Housing Need will be commensurate with the regional need for Low or Moderate Income Housing, considered with the proportion of the municipality's population that consists of Low Income Persons;

"2. the weight of the Local Concern will be commensurate with the

Under G. L. c. 40B, § 22, the HAC's decision may be reviewed in the Superior Court under G. L. c. 30A, which in turn provides that the court may set aside the decision of the agency "if it determines that the substantial rights of any party may have been prejudiced because the agency decision is . . . [u]nsupported by substantial evidence; or . . . otherwise not in accordance with law." G. L. c. 30A, § 14(7). See *Wellesley I, supra* at 657 ("decision of HAC must be upheld if it is supported by substantial evidence," which is "such evidence as a reasonable mind might accept as adequate to support a conclusion"). In this analysis, we give "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it," G. L. c. 30A, § 14 (7), and we "apply all rational presumptions in favor of the validity of the administrative action." *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 524 (2007), quoting *Wellesley I, supra* at 654. "A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Wellesley I, supra* at 657, quoting *Labor Relations Comm'n* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971).

*Discussion.* 1. *Calculating the regional need for low and moderate income housing.* The board contends that the HAC erred in refusing to consider the availability of low-cost, market-rate, unsubsidized housing in the town in weighing the town's local concerns against the housing need. The town points to testimony from its expert, Richard Heaton, that the town has "one of the highest percentages of rental housing" in the Commonwealth, that "83% of all existing rental housing units in

degree to which the health and safety of occupants or municipal residents is imperiled, the degree to which the natural environment is endangered, the degree to which the design of the site and the proposed housing is seriously deficient, the degree to which additional Open Spaces are critically needed in the municipality, and the degree to which the Local Requirements and Regulations bear a direct and substantial relationship to the protection of such Local Concerns; and

"3. a stronger showing shall be required on the Local Concern side of the balance where the Housing Need is relatively great . . . ."

760 Code Mass. Regs. § 56.07(3)(b) (2012).

Sunderland are being rented at affordable rents, even though they may not be subsidized," and that forty-six per cent of Sunderland's housing stock is rented at "affordable" prices as designated by the department. We conclude that the HAC did not err in excluding housing that is not subsidized by the Federal or State government in weighing the regional need for affordable housing. See *Zoning Bd. of Appeals of Lunenburg* v. *Housing Appeals Comm., ante* 38, 44-48 (2013).

The board's argument fails because it conflicts with the plain meaning of the language of the act. Under G. L. c. 40B, § 20, housing need is effectively defined as "the regional need for low and moderate income housing considered with the number of low income persons in the city or town affected," because that is the factor that is to be considered in determining whether local requirements or regulations are "consistent with local needs." This definition is made explicit in the department's regulations, where "[h]ousing [n]eed" is defined using almost the exact same language. 760 Code Mass. Regs. § 56.02 (2012).[6] The act defines "[l]ow or moderate income housing" to mean "any housing *subsidized by the federal or state government* under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute, whether built or operated by any public agency or any nonprofit or limited dividend organization" (emphasis added). G. L. c. 40B, § 20. Therefore, the plain text of both the act and the governing regulations require the HAC, in weighing the housing need, to exclude from consideration any affordable housing that is not subsidized under a qualifying government-sponsored program. See *Wellesley I, supra* at 654.[7]

This interpretation is in harmony with the purpose of the act.

---

[6]The only difference between the statutory and regulatory definitions is that G. L. c. 40B, § 20, refers to the "number of low income persons in the *city or town* affected" (emphasis added), and the regulation refers to the "number of Low Income Persons in a *municipality* affected" (emphasis added). 760 Code Mass. Regs. § 56.02 (2012).

[7]Housing developed under a State or Federal subsidy program only addresses the relevant housing need if the program "assist[s] the construction of low or moderate income housing as defined in the applicable federal or state statute." G. L. c. 40B, § 20. If the applicable statute or regulation of the subsidizing agency does not define low or moderate income housing, the regulations of the department provide that "it shall be defined as units of

The act was originally drafted to address "an acute shortage of *decent, safe,* low and moderate cost housing throughout the commonwealth" (emphasis added). *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 351 (1973). Some market rate housing may be affordable because the units are neither decent nor safe. Other affordable market rate housing units may be both decent and safe, but may be affordable only temporarily because of a weak housing market. As the housing market strengthens, there is no way to ensure that rental payments for market rate housing units may not rise to levels that would be unaffordable to low or moderate income households, either because of over-all rising rental prices or because landlords decide to improve or enlarge the units. Nor is there any way to ensure that affordable units in market rate housing projects will be limited in availability to low or moderate income households, especially where the town attracts many students living off-campus from the University of Massachusetts in nearby Amherst.

In contrast, precisely because such housing is subsidized by a Federal or State government or agency under a program to assist the construction of affordable housing, see note 7, *supra,* housing that would address the "regional need for low and moderate income housing" under G. L. c. 40B, § 20, typically must satisfy minimum requirements designed to ensure the quality of the housing and the reasonableness of the rental rate.[8] Furthermore, unless the statute or regulation applying to the

housing whose occupancy is restricted to" an income eligible household, which is defined as "a household of one or more persons whose maximum income does not exceed 80% of the area median income, adjusted for household size, or as otherwise established by the Department in the guidelines." 760 Code Mass. Regs. § 56.02.

[8]See, e.g., Department of Housing and Community Development, Comprehensive Permit Guidelines § II(A)(1) (July 30, 2008) (comprehensive permit guidelines) ("[g]enerally, the housing program, through its statutory basis, regulations, or guidelines establishes the maximum monthly housing cost" for affordable units in subsidized projects, but where program does not, monthly rental housing cost is capped at "30% of monthly income for a household earning 80% of area median income, adjusted for household size"); Department of Housing and Community Development, HOME Investment Partnerships Program (HOME) and Housing Stabilization Fund (HSF) Rental Housing Programs Application Guidelines §§ D-H (Feb. 2010) (housing projects constructed with HOME or HSF funds are subject to various "[p]roperty

subsidizing agency in question provides otherwise, occupancy of subsidized affordable low or moderate income housing units under the department's comprehensive permit regulations is restricted to "income eligible households," defined as households "whose maximum income does not exceed 80% of the area median income, adjusted for household size." 760 Code Mass. Regs. § 56.02. These "[u]se [r]estrictions" are accomplished through deed restrictions or other legally binding instruments that run with the land. *Id.* They are recorded at the registry of deeds, and they limit occupancy "during the term of affordability" established in a construction subsidy agreement. *Id.* 760 Code Mass. Regs. § 56.05(13) (2012).[9] Also, in order to be included on the SHI, subsidized affordable rental housing units must be leased under an "affirmative fair marketing plan" that

---

[s]tandards," affordability and availability requirements, and rental rate limitations).

[9]Furthermore, we note that where low or moderate income housing is built under a comprehensive permit obtained in accordance with G. L. c. 40B, §§ 20-23 (act), and "where a comprehensive permit itself does not specify for how long housing units must remain below market, the Act requires an owner to maintain the units as affordable for as long as the housing is not in compliance with local zoning requirements, regardless of the terms of any attendant construction subsidy agreements." *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. 811, 813 (2002). See also 760 Code Mass. Regs. § 56.04(7) (2012) ("[f]ollowing the issuance of a Comprehensive Permit, the Subsidizing Agency shall issue its final written approval of the Project to the Applicant," and "[s]uch approval shall, at a minimum: . . . confirm that the proposed Use Restriction is in a form consistent with Department guidelines").

Additionally, under § II(A)(1) of the department's comprehensive permit guidelines, for housing to be included in the subsidized housing inventory (SHI):

"All Use Restrictions must meet the following minimum standards:
. . .

"[Applies] for a term . . . that shall be not less than 15 years for rehabilitated units and not less than 30 years for newly created units.

"Effectively restricts occupancy of Low and Moderate Income Housing to Income Eligible Households. . . .

"Contains terms and conditions for the resale of a homeownership unit, including definition of the maximum permissible resale price, and for the subsequent rental of a rental unit, including definition of the maximum permissible rent."

provides for a lottery or other resident selection process and "effective outreach to protected groups underrepresented in the municipality." 760 Code Mass. Regs. §§ 56.02 (defining "Affirmative Fair Marketing Plan" and providing that "[i]t shall be the responsibility of the Subsidizing Agency to enforce compliance with provisions of 760 [Code Mass. Regs. §] 56.00 and applicable Department guidelines relating to matters including Affirmative Fair Marketing Plans . . . and Use Restrictions"). Department of Housing and Community Development, Comprehensive Permit Guidelines § II(A)(1) (July 30, 2008) (comprehensive permit guidelines) ("affordable housing units shall be subject to an Affirmative Fair Marketing and Resident Selection Plan that, at a minimum, meets the requirements set out in the following Section III, Affirmative Fair Housing Marketing Plan").[10] In light of these differences between subsidized affordable housing units and unsubsidized market-rate units, we agree with the HAC that "the [L]egislature required a state or federal subsidy in order to ensure that housing constructed under the law would be subject to enforceable controls on quality, sales price or rental rate, manner of marketing, and income of the occupants — all factors essential to the long term stability of affordable housing." Therefore, where none of the conclusive presumptions in favor of the board's denial of the comprehensive permit application applies, we hold that only housing that is actually "subsidized by the [F]ederal or [S]tate government" under a qualifying program may be counted in evaluating whether the regional need for low or moderate income housing is outweighed by local concerns. See G. L. c. 40B, § 20.

In this case, the HAC defined the pertinent "region" by which to measure the regional need for low and moderate income housing to include the town and the five nearby towns of Amherst, Deerfield, Hadley, Montague, and Whatley, as proposed by Sugarbush's expert, Lynne D. Sweet, rather than the fifty-five municipalities within a twenty-mile radius of the town, as

---

[10]Although the comprehensive permit guidelines were not introduced in evidence before the HAC, they are directly relevant to understanding the department's regulations, because subsidizing agencies have "the responsibility . . . to enforce compliance with provisions of 760 [Code Mass. Regs. §] 56.00 and applicable Department guidelines." 760 Code Mass. Regs. § 56.02.

proposed by the board, which would include the cities of Springfield, Northampton, Holyoke, and Chicopee. The word "region" is not defined in either the act or the regulations; furthermore, neither the act nor the regulations provide any guidance as to how to determine the relevant region to be used in evaluating the regional need for low and moderate income housing. In the absence of such guidance, the HAC must exercise its discretion in determining the appropriate "region." See *Hastings* v. *Commissioner of Correction*, 424 Mass. 46, 49 (1997), quoting *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 312-313 (1981) ("It is a recognized principle of administrative law that an agency may adopt policies through adjudication as well as through rulemaking, . . . and 'the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency' ").[11]

Giving the appropriate deference to the HAC, we hold that its determination that the six-town region identified by Sweet is the appropriate region was supported by substantial evidence. Sweet testified that she established the six-town region based on the National Council of Affordable Housing Market Analysts standards "for examining supply and demand for the need for housing." The alternative proposed by the board was derived solely from a literal interpretation of Sweet's oral testimony, where she described the six-town region as "cover[ing] about a 20-mile radius." The board argued that, if the town were the focal point, a twenty-mile radius would include fifty-five municipalities. It was within the HAC's discretion to find that the region should not be measured by that radius but by a generally accepted standard applied by affordable housing market analysts and supported by the balance of Sweet's expert testimony.

We further conclude that there was substantial evidence to

---

[11]We note that regulations promulgated after notice and comment further defining what "region" should be examined in determining "regional need" for affordable housing "would fall within the department's broad authority and would provide clear standards to enable consistent decision-making by the HAC." *Board of Appeals of Woburn* v. *Housing Appeals Comm.*, 451 Mass. 581, 597 (2008) (Marshall, C.J., concurring) (more detailed regulatory definition of "uneconomic" would be helpful, as that term is used under act).

support the HAC's finding of a "substantial regional housing need" based on the limited availability of low and moderate income housing subsidized by the Federal or State government within the six-town region. The department's records revealed that the town had only six affordable units of housing listed on the SHI, less than 0.4 per cent of its over-all housing stock, and that the six towns in the region had an overall SHI percentage of less than nine percent.[12] In addition, Sweet testified that the three housing authorities in the six-town region had 434 residents waiting for public housing, with a wait of between two and five years for family units.

2. *Fire safety concerns.* One of the categories of local concern that must be weighed by the HAC against the housing need in deciding whether the board's denial of the comprehensive permit application is "consistent with local needs" is "the need to protect the health or safety of the occupants of the proposed housing or of the residents of the city or town." G. L. c. 40B, § 20. See 760 Code Mass. Regs. § 56.07(3)(b) (2012) (among other factors, "weight of the Local Concern will be commensurate with the degree to which the health and safety of occupants or municipal residents is imperiled"). Therefore, the safety of the project residents and local fire fighters in the event of a fire at the project is properly a local concern that must be weighed by the HAC. The HAC weighed these safety concerns, and concluded that the board "failed to meet its burden of establishing a specific local fire-safety concern . . . that outweighs the regional need for housing."

---

[12]We note that the calculation of the SHI as defined in the department's regulations includes, in addition to subsidized housing that meets the definition of "low or moderate income housing" in G. L. c. 40B, § 20, housing that may fall outside this definition, including "any other housing unit as may be allowed under the Department's guidelines, provided that such housing unit is subject to a Use Restriction and Affirmative Fair Marketing Plan, and regardless of whether or not such unit received a Subsidy." 760 Code Mass. Regs. § 56.02. See comprehensive permit guidelines, *supra* at § II(A)(2) (allowing inclusion on SHI of "all of the units in [a] rental development" if certain percentage of units are to be occupied by low-income households). We need not address whether the inclusion of nonsubsidized housing units in the SHI is permissible under the act because, even if the SHI included housing units that were not "low or moderate income housing" as defined in § 20, the SHI for both the town of Sunderland (town) and the six-town region still fell below the ten per cent threshold.

At the HAC hearing, the town's fire chief, Robert T. Ahearn, testified on behalf of the board that the height of each of the proposed buildings in the project is approximately forty-two feet, and that the town lacks the equipment needed to obtain access to the roof in the event of a "structural fire," because it does not possess a ladder truck and its largest ground ladder has a maximum height of thirty-five feet. Chief Ahern asserted, "In combating any structural fire, it is a universally accepted practice and absolutely essential we obtain quick and efficient access to . . . all the portions of the roof so as to create the necessary ventilation to allow for the escape of heat and smoke." "Without access to the roof," he opined, "there is . . . a substantially increased risk of severe injury or death of residents or firefighting personnel." The fire chief acknowledged that "sprinklers provide a benefit" but noted that, "in a raging fire in a wood-framed building, sprinklers alone are insufficient to put the flames out." He also declared that a fire department must prepare for "a worst case scenario," which would include a partial or complete failure of a sprinkler system. The chief also acknowledged that the neighboring town of Amherst possesses a ladder truck, but he testified that mutual aid from another municipality's fire department "must be viewed as a last resort," and such aid would never be viewed by a fire professional as "a primary means of combating a fire." He concluded that the project should not be built unless the town fire department is provided with a ladder truck and a garage to store it, which the town financially cannot afford,[13] and that he "would not be able to endorse the Project" in light of what he characterized as "design flaws." Walter B. Adams, who is a registered architect, a licensed construction supervisor, and a certified building official, also testified for the board, stating that the town's fire chief has "the authority under the building code to refuse the approval of a building permit submission if it is found that the submitted design does not provide acceptable Building and site access for fire fighting and/or rescue vehicle(s) and personnel."

Sugarbush offered the testimony of Mark B. Darnold, a registered professional civil engineer, who testified that the

[13]Margaret Nartowicz, the town administrator, also testified that the town could not afford to purchase a fire ladder truck and a garage to house it.

town of Amherst's forty-eight-foot long aerial platform fire truck could respond to a fire at the project, could reach the roofs of the housing complex, and "could safely maneuver through the site and access each of the proposed buildings." He opined that "the Project complies with [F]ederal or [S]tate statutes or regulations and with generally recognized standards with regard to firefighting access." Sugarbush also offered expert testimony from engineer Kevin S. Hastings, who stated that the presence of alternative safety measures, including a state-of-the-art sprinkler system and the availability of fire departments of surrounding communities to provide assistance, ensures that the buildings "do not represent an unusual fire or life safety hazard which would require a ladder truck." He concluded that "the proposed project will comply with Federal, State and local codes relating to fire safety and good fire safety practices" and that, with the project's sprinkler system, the "overall level of occupant and fire fighter safety" will be greater in the proposed buildings than in a building that meets the town's thirty-five-foot height limitation in residential zoning districts but lacks such sprinkler protection.

The HAC noted that the most common sprinkler system proposed in previous projects it had reviewed was designed to protect the lives of the building's occupants but the system proposed here was more extensive, including sprinkler heads in attics and other concealed spaces, and therefore provided "greater protection for the building itself." It also found that, while it is unlikely that the town of Amherst's ladder truck can be counted on as a first responder to a fire at the project, it appeared that it would be available to assist in the type of multi-alarm, mutual aid emergency that may require ventilation of the roof to fight a structural fire. It also noted that the town, by special permit issued by the planning board, allows a building height of forty-five feet for multiple story buildings in planned unit developments in the town's residential and commercial districts, which suggests an acknowledgment by the town that a building may be as tall as forty-five feet and potentially still be safe even though the town has no ladder truck. We conclude that each of these factual findings was supported by substantial evidence.[14]

[14]The HAC also rejected the fire chief's opinion that access to the roof of a

The board claims that Sugarbush failed to establish a prima facie case that its proposal complied with State statutes and regulations, contending that it violated the State building code (code) with respect to fire safety.[15] The code in effect when the HAC issued its decision on June 21, 2010, was the seventh edition, 780 Code Mass. Regs. §§ 1.00-120.00 (2009), which required a building official before issuing a building permit to transmit "the fire protection construction documents (780 [Code Mass. Regs. §] 901.7.1.1) and building construction documents" to the local fire chief "for review and approval of the items specified in 780 [Code Mass. Regs. §] 901.7.1.1." 780 Code Mass. Regs. § 901.7.2 (2008). The items specified in 780 Code Mass. Regs. § 901.7.1.1 (2008) concern the design and construction of fire protection systems, such as automatic sprinkler systems, smoke control and exhaust systems, and emergency alarm systems, but also include "[b]uilding and site access for fire fighting and/or rescue vehicle(s) and personnel." 780 Code Mass. Regs. § 901.7.1.1(2) (2008). The board contends that where, as here, fire fighters cannot gain access to the roof of a proposed building without a ladder truck that the town does not possess, a fire chief may not approve the fire protection construction documents and a building permit may not issue because the construction of such a building would violate the code. We do not interpret the provision of the code requiring "building . . . access for fire fighting . . . personnel" to declare

building is "absolutely essential," stating that it is "common knowledge" that fire fighters on occasion must enter buildings to fight fires even when their ladders cannot reach the upper floors. We conclude that, to the extent the HAC was suggesting that it may be safe for fire fighters to combat a fully-involved structural fire without access to the roof and to ventilate the roof from inside the building, this assertion of "common knowledge" is not sufficient to provide substantial evidence for such a finding.

[15]Where a board has denied a comprehensive application, a developer "may establish a prima facie case by proving . . . that its proposal complies with federal or state statutes or regulations, or with generally recognized standards as to matters of health, safety, the environment, design, open space, or other matters of Local Concern." 760 Code Mass. Regs. § 56.07(2)(a)(2) (2012). Once the developer establishes this prima facie case, the burden shifts to the board to prove "first, that there is a valid health, safety, environmental, design, open space, or other Local Concern which supports such denial, and then, that such Local Concern outweighs the housing need." 760 Code Mass. Regs. § 56.07(2)(b)(2).

that a building is in violation where its roof cannot be accessed by any ladder possessed by the local fire department. Nor do we interpret this provision to suggest that a fire chief must refuse to approve the fire protection construction documents where his department does not have a ladder truck that would allow fire fighter access to the roof of the proposed building.[16]

A fire chief does not have unbridled discretion effectively to deny a comprehensive permit by refusing to approve fire construction documents based on the height of a proposed building and the absence of a town ladder truck. In the context of a comprehensive permit application, the board has "the same power to issue permits or approvals as any local board or official who would otherwise act with respect to such application, including but not limited to the power to attach to said permit or approval conditions and requirements with respect to height, site plan, size or shape, or building materials." G. L. c. 40B, § 21. Under both the seventh and the presently-applicable eighth editions of the code, the fire chief reports the result of his review of construction documents to the "building official," 780 Code Mass. Regs. § 901.7.2 (2008) (seventh edition); 780 Code Mass. Regs. § 107.1.2 (2010) (eighth edition), and it is the building official who is the "officer or other designated authority charged with the administration and enforcement of [the code]." 780 Code Mass. Regs. § 202 (2009).[17] Therefore, in the context of a comprehensive permit application, just as the building official is a "[l]ocal [b]oard" within the definition of

[16]We note that, in August, 2010, an eighth edition of the Massachusetts building code became effective that adopted the International Building Code (2009 edition), while adding its own Massachusetts amendments. 780 Code Mass. Regs. § 101.1 (2010). Nothing in the new code affects our analysis or conclusions. The code now in effect still requires construction documents for the fire protection systems, including "building and site access for fire-fighting and/or rescue vehicle(s) and personnel," 780 Code Mass. Regs. § 901.2.1(1) (2010), to be reviewed and approved by the fire chief or his designee. 780 Code Mass. Regs. § 107.1.2. Furthermore, it requires a fire chief, in the event of disapproval, to notify the building official in writing and cite "relevant sections of non-compliance" with the code or referenced standards. *Id.*

[17]In the eighth edition of the code, this definition was rephrased as the "building commissioner/inspector of buildings, local inspector or state building inspector charged with the administration and enforcement of this code." 780 Code Mass. Regs. § 202 (2010).

464 Mass. 166 (2013)                                              183

Zoning Board of Appeals of Sunderland *v.* Sugarbush Meadow, LLC.

G. L. c. 40B, § 20,[18] the fire chief is a "local board or official who would otherwise act with respect to such application," and the board in reviewing such application has the "same power to issue . . . approvals" as the fire chief. G. L. c. 40B, § 21. See *Dennis Hous. Corp.* v. *Zoning Bd. of Appeals of Dennis*, 439 Mass. 71, 79 (2003) ("[i]t would be anomalous to hold that the zoning board's powers in the comprehensive permit scheme include the powers held by the building inspector in enforcing local requirements, but not the powers of the local agency for which the building inspector functions as enforcer"). Since the HAC has the same power to issue permits or approvals as the board, the HAC has the authority to evaluate the fire chief's recommendation in the context of the comprehensive permit. 760 Code Mass. Regs. § 56.07(6)(b) (2012). See *Zoning Bd. of Appeals of Groton* v. *Housing Appeals Comm.*, 451 Mass. 35, 40 (2008).[19]

---

[18]The act defines "[l]ocal [b]oard" to include "the officer or board having supervision of the construction of buildings or the power of enforcing municipal building laws . . . ." G. L. c. 40B, § 20.

[19]The HAC, in specifying the conditions under which a comprehensive permit should be issued, specifically gave the board an opportunity to bring to the HAC's attention any "additional reasonable conditions that might be imposed on this development to assist the fire department in fighting a major fire in one of the buildings" by filing a motion to modify the decision within thirty days of the date of the decision. The board did not avail itself of this opportunity.

Further, the HAC required that the board "take whatever steps are necessary to insure that a building permit is issued to the applicant, without undue delay, upon presentation of construction plans, which conform to the comprehensive permit and the Massachusetts Uniform Building Code." In doing so, the HAC implicitly recognized that the final construction documents, which must be submitted before the issuance of a building permit, may differ from the initial plans presented at the comprehensive permit stage, and therefore affirmed the authority of the fire chief to examine the submitted construction documents for "review and approval." 780 Code Mass. Regs. § 107.1.2 (2010) (if fire chief "disapproves such construction documents, he or she shall notify the *building official* . . . in writing citing relevant sections of noncompliance with this code or the section of the referenced standards of Chapter 35"). The eighth edition of the building code provides a list of twenty-two different considerations that may be reviewed and approved by the fire chief as part of the "Construction Documents," including "[f]ire hydrant(s) location and water supply information"; "[t]ype/description and design layout of the fire extinguishing system(s)"; and "[t]ype/description and location of any emergency alarm system." 780 Code Mass. Regs. § 901.2.1(1) (2010). Upon reviewing the construction documents in this case, the fire chief

We conclude that the HAC's determination that the board failed to meet its burden of establishing that the fire safety concern outweighs the regional need for low and moderate income housing was supported by substantial evidence.[20] From the evidence before it, the HAC reasonably concluded that the additional risk to occupants and fire fighters created by the inability of fire fighters to gain direct access to the roof of the buildings with the ladders possessed by the town's fire department was minimal in light of the advanced sprinkler system to be installed in the buildings, which would diminish the risk of a structural fire that would require ventilation of the roof, and the likelihood that, should such a structural fire occur despite the sprinkler system, a ladder truck would be made available through mutual aid from the adjoining town of Amherst. Furthermore, it was not unreasonable for the HAC to be skeptical of the fire chief's testimony that a building is unsafe if its roof can only be reached with a ladder truck where the town's zoning bylaw allowed a building height of forty-five feet by special permit, even if no such permit had yet been issued.[21] Finally, where, as here, the HAC heard competing experts, "[i]t is for the agency, not the reviewing court, to weigh credibility of witnesses and resolve factual disputes involving contradictory testimony." *MacLean* v. *Board of Registration in Nursing*, 458 Mass. 1028, 1030 (2011), quoting *Duggan* v. *Board of Registration in Nursing*, 456 Mass. 666, 674 (2010).

3. *Fiscal impact.* At the HAC hearing, town administrator

---

may decline to give his approval based on any of these items. However, we note that we have concluded that a building is not in violation of 780 Code Mass. Regs. § 901.2.1(1)(b) (2010), which requires that construction documents include "[b]uilding . . . access for fire-fighting . . . personnel," solely because its roof cannot be accessed by any ladder possessed by the local fire department. See *supra* at 181-182.

[20]In reaching this conclusion, we give no weight to the HAC's suggestion that a fire fighter may safely combat a fully involved structural fire without access to the roof. See note 14, *supra*.

[21]We have noted that height limitations have often been used by towns "as a pretext to exclude affordable housing." See *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 29 (2006). See also *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 349 (1973) ("Building height limitations were also found to have a significant negative impact on low and moderate income housing").

Margaret Nartowicz testified that the project would increase the town's population and over-all housing stock by approximately nine per cent, and that it would be "necessary" to hire two additional police officers at an average yearly salary of $38,000 per officer and two additional fire fighters/emergency medical technicians at an average salary of $36,000. In addition, she testified that the project would likely increase the town's school age population by fifty-four children and, at a conservative estimate cost of $8,193 per student in the system, even one-half this number of additional school-aged children would pose a serious problem to the funding of the town's educational services. She opined that these additional expenses, along with the purchase of a ladder truck, the construction of a garage to house the truck, and unspecified additional maintenance expenses for roads, sidewalks, and drainage in the area of the development and along nearby Route 116, would far exceed the expected tax revenue from the project of $225,000.

The HAC granted Sugarbush's motion for summary decision as to this issue, concluding that the board could not justify its denial of the comprehensive permit based on the burdens the project would pose on municipal services and infrastructure because it failed to allege that these increased services or infrastructure were not technically or financially feasible, or that they arose from unusual topographical, environmental, or other physical circumstances. We conclude that the HAC did not err in refusing to consider fiscal impact as a local concern that must be weighed against the housing need in determining, on balance, whether the board's denial of the comprehensive permit application was consistent with local needs.

As noted earlier, G. L. c. 40B, § 20, specifically provides the criteria that may be examined by the board and the HAC in determining whether local requirements and regulations are consistent with local needs. Under the act, the regional need for low and moderate income housing is balanced against "the need to protect the health or safety of the occupants of the proposed housing or of the residents of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces." G. L. c. 40B, § 20. Therefore, the plain text of the statute lends no support to the

argument that additional considerations unrelated to health or safety, site or building design, or open spaces may be considered in determining whether the "denial of the application . . . was reasonable and consistent with local needs." G. L. c. 40B, §§ 20, 23. See *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 31 (2006) ("interest in the provision of critically needed affordable housing must be balanced against the statutorily authorized interests in the protection of the safety and health of the town's residents, development of improved site and building design, and preservation of open space").

The department allows fiscal impact to a town to be considered in only one circumstance: if a board's denial of a comprehensive permit is based on

> "the inadequacy of existing municipal services or infrastructure, the Board shall have the burden of proving that the installation of services adequate to meet local needs is not technically or financially feasible. Financial feasibility may be considered only where there is evidence of unusual topographical, environmental, or other physical circumstances which make the installation of the needed service prohibitively costly."

760 Code Mass. Regs. § 56.07(2)(b)(4) (2012). In short, the department has interpreted the specified statutory factors to include the financial unfeasibility of providing additional municipal services or infrastructure in the single, limited circumstance where the addition of such services would be prohibitively costly as a result of "unusual . . . physical circumstances." *Id.* Where no such physical circumstances are present, the agency's interpretation bars the board and the HAC from considering the financial burden of additional municipal services or infrastructure. Giving proper deference to the department's interpretation of the statute it is charged with administering, we conclude that this regulation limiting the extent to which fiscal impact may be deemed a local concern is "in harmony with the legislative mandate." *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 595 (1992) (where statute is ambiguous, agency's regulations "are not to be declared void unless their provisions cannot by any reasonable construction be

interpreted in harmony with the legislative mandate"). See *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 632-633 (2005). When such unusual physical circumstances are not present, a town may address the alleged inadequacy of municipal services through conventional budget adjustments. But where installing additional municipal services or infrastructure is prohibitively costly due to unusual physical circumstances, the town may need to make extraordinary budget adjustments in order to provide the additional services, which may affect the "health or safety of the occupants of the proposed housing or of the residents of the city or town." G. L. c. 40B, § 20. Furthermore, by limiting the context in which fiscal burden may be considered, this regulation avoids the complex and difficult examination of whether affordable housing creates a net positive or negative impact on a town's economy and budget, and thus furthers the statutory purpose of "provid[ing] relief from exclusionary zoning practices which prevent[] the construction of badly needed low and moderate income housing." *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 354 (1973).[22]

Here, the board made no showing that the need for additional municipal services in the form of more police, fire fighters, and educators, or from maintenance of nearby roads, sidewalks, and drainage areas, arose from any reason other than the number of additional residents anticipated to reside in the project. The only

[22]We note that measuring fiscal impact by comparing the revenues anticipated from a project's property taxes with the anticipated additional police, fire, and school expenditures may overstate the negative fiscal impact by failing to consider the secondary economic benefits that accrue from a project. The research studies we have found suggest that, when all the economic factors that are affected by the construction, rehabilitation, and occupation of new housing are considered, the development of additional subsidized or affordable housing within a municipality generally results in either a neutral or beneficial fiscal impact to the town and its over-all economy. See generally K. Waldrip, L. Williams, & S. Hague, The Role of Affordable Housing in Creating Jobs and Stimulating Local Economic Development: A Review of the Literature, Center for Housing Policy (Jan. 2011); E. Nakajima, K. Modzelewski, & A. Dale, The Fiscal Impact of Mixed-Income Housing Developments on Massachusetts Municipalities: A Report for Citizens' Housing and Planning Association (May 2007); D. Ives-Dewey, The Multi-Family Myth: Exploring the Fiscal Impacts of Apartments in the Suburbs, 40 Middle States Geographer 39 (2007).

municipal expense that would have arisen from the unusual physical circumstances of the project, specifically the height of its buildings, was the town's professed need for a ladder truck and garage, but the HAC reasonably determined that the town need not incur this expense to ensure an appropriate level of fire safety. Where, as here, the adverse fiscal impact the town would allegedly suffer is based on the inadequacy of existing municipal services or infrastructure and does not derive from the unusual topographical, environmental, or other physical circumstances of the project, the HAC correctly determined that such impact may not be weighed in the "consistent with local needs" balancing test. See 760 Code Mass. Regs. § 56.07(2)(b)(4).

4. *Wetlands protection.* Under § 122-2 of the town wetlands bylaw, apart from exceptions not applicable here, "no person shall remove, fill, dredge, alter or build upon or within one hundred (100) feet" of any wetland unless permitted by the town's conservation commission. The board, in denying the comprehensive permit, found that Sugarbush had failed to provide the proof that would be required by the town's conservation commission to conclude that the alterations proposed are consistent with the interests protected by the local wetlands bylaw.[23] The HAC concluded that the board "does not affirmatively even state that damage to wetlands will occur or describe that damage, much less prove that it will happen," and thus failed to show that local wetlands concerns outweigh the regional need for housing. We conclude that the HAC's decision was supported by substantial evidence.[24]

---

[23]The board acknowledges that it exercised the jurisdiction of the conservation commission in reviewing the comprehensive permit application. While conservation commissions are not specifically listed in the definition of "[l]ocal [b]oards" in G. L. c. 40B, § 20, whose ordinary jurisdiction may be exercised by the zoning board under G.L. c. 40B, § 21, we have noted that the "list of local agencies and officials that comprise the definition of 'local board' is not intended to be a list of the precise names of such local agencies, but rather encompasses local agencies and officials performing comparable functions to the listed forms of 'local board.' " *Dennis Hous. Corp. v. Zoning Bd. of Appeals of Dennis*, 439 Mass. 71, 78 (2003). Applying that functional analysis here, we agree that the conservation commission constitutes a "local board" under § 20. See *id.*, citing *Quinn v. Zoning Bd. of Appeals of Dalton*, 18 Mass. App. Ct. 191, 193, 196-197 & n.12 (1984) (conservation commission is among "local boards" entitled to receive notice of comprehensive permit application).

[24]We recognize that the Superior Court judge correctly concluded that the

464 Mass. 166 (2013)                                              189

Zoning Board of Appeals of Sunderland v. Sugarbush Meadow, LLC.

In the prehearing order, the board declared that it would "show that because of the property's propensity for flooding and the stormwater facilities' proximity to wetlands, the development will not adequately protect wetlands resource areas . . . ."[25] Yet, at the hearing on the merits before the HAC, none of the town's experts testified that the project would adversely affect the wetlands or other protected areas on the property. Rather, Sugarbush's expert, Michael J. Marcus, a senior scientist at a "full service environmental consulting company," testified that "[t]he proposed work within the 100 foot wetland buffer zone complies with both local and state wetland regulations for work within a wetland buffer zone." Where, as here, the board accepted the burden to show that the development will not adequately protect wetlands and failed to meet that burden, the HAC was supported by substantial evidence in so finding.

5. *Application fee to pay board's legal counsel.* Under the town's comprehensive permit rules, as part of the application, the developer must pay a primary filing fee of $1,000 plus $50 per housing unit (in this case, $8,500); a $5,000 fee to retain a financial consultant; and, where the proposed project exceeds 75 units, an additional fee of $10,000 "to pay for the services of [the board's] legal counsel for assistance." Comprehensive Permit Rules of the Board § 3.02 (2006). Sugarbush challenged only the $10,000 legal fee assessed as a filing fee.

Under the department's regulations, a board "may require the payment of a reasonable filing fee with the application . . . to defray the direct costs of processing applications, and taking into consideration the statutory goal of [G. L.] c. 40B, §§ 20 through 23 to encourage affordable housing development." 760

HAC erred in declaring that the local bylaw is not stricter than the State Wetlands Protection Act, but this error does not affect our conclusion that the HAC's decision was supported by substantial evidence because, in conducting the balancing test, the HAC assumed that the local bylaw was more strict than State law.

[25] Title 760 Code Mass. Regs. § 56.06(7)(d)(3) (2012) provides that, "[p]rior to the evidentiary portion of the hearing, the presiding officer may issue a prehearing order, which, if possible, shall be drafted jointly by the parties," and may include, among other things, "agreed facts, stipulations, admissions, and other agreements of the parties," along with "a list of the contested issues of fact and law together with the burdens of proof established by 760 [Code Mass. Regs. §] 56.07(2)."

Code Mass. Regs. § 56.05(2) (2012). Where a board determines that it needs technical advice to review a comprehensive permit application, it may also require the applicant to pay a reasonable fee to retain outside consultants. 760 Code Mass. Regs. § 56.05(5) (2012). The latter regulation, however, clearly states, "Legal fees for general representation of the Board or other Local Boards shall not be imposed on the Applicant." *Id.* The HAC found that the $10,000 legal fee assessed here was distinct from the general filing fee of $8,500 and was not a reasonable filing fee under § 56.05(2), but was instead "a fee for general legal representation that is prohibited under our regulations and precedents."

The board contends that, because it retained counsel to assist the board with the many legal issues that arise in considering a § 40B application, and reasonably estimated the legal fee to be $10,000, the fee for legal services was not a consultant's fee under § 56.05(5) but a filing fee under § 56.05(2), reasonably assessed "to defray the direct costs of processing applications." The board also contends that, even if the fee were a forbidden consultant fee, HAC did not have statutory jurisdiction to order a refund of this fee because, under G. L. c. 40B, § 23, the hearing "shall be limited to the issue of whether, in the case of the denial of an application, the decision of the board of appeals was reasonable and consistent with local needs."

We conclude that the HAC had substantial evidence to determine that the $10,000 fee was a prohibited consultant fee for general legal representation. The HAC made clear that, in appropriate circumstances, where an attorney's specialized legal expertise is needed to review technical aspects of a proposal, such as title questions, a board may assess the legal fee as a consultant's fee under § 56.05(5). But it found that the legal fee here was for general legal representation by the board's special counsel who attended all the local hearings and represented the board in the appeal to the HAC. The board may not evade the regulatory prohibition against burdening the applicant with legal fees arising from the board's general representation simply by characterizing the legal fee as a filing fee, especially where it would be a second such fee above and beyond

the usual filing fee. We find that the HAC did not err in preventing its regulations from being so easily evaded.[26]

Finally, we conclude that the HAC's jurisdiction includes the authority to ensure that developers seeking approval under the act to build low and moderate income housing are not assessed fees that are prohibited by its regulations. "Where the focus of the statutory enactment is one of reform, as is indisputably true of the act, . . . 'the administrative agency charged with its implementation should construe it broadly so as to further the goals of such reform.' " *Zoning Bd. of Appeals of Amesbury* v. *Housing Appeals Comm.*, 457 Mass. 748, 761-762 (2010), quoting *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 524 (2007). If the HAC lacked jurisdiction to remedy the imposition of an illegal fee, a board would be able to impose burdensome "application fees" on G. L. c. 40B developers, and a developer whose application was denied would need to file two separate appeals: one with the HAC to challenge the denial of the application, and another in the Superior Court in the form of a declaratory action to determine whether the board had the authority to require the fee. We conclude that the "consequences of this dual system of review could be devastating in terms of costs and delays, and the creation of new affordable housing would be impeded or even prevented by such a tedious process." *Zoning Bd. of Appeals of Amesbury* v. *Housing Appeals Comm.*, *supra* at 761. "In addition to streamlining the permitting process, the Legislature sought to 'promote affordable housing by minimizing lengthy and expensive delays occasioned by court battles commenced by those seeking to exclude affordable housing from their own neighborhoods.' " *Id.*, quoting *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 29 (2006). Given this purpose, we do not understand the Legislature in limiting the issues to be decided at an HAC hearing in G. L. c. 40B, § 23, to have intended that the HAC would be unable to enforce its own rules limiting the amount of filing fees and

---

[26]Because the HAC's decision rested on the filing fee being a prohibited fee for general legal representation rather than on being unreasonable in amount, we need not address the board's argument that Sugarbush failed to meet its burden of proving that the fees were unreasonable.

that an applicant would need to expend the time and money to bring a separate action to remedy the regulatory violation.

*Judgment affirmed.*